## MARYLAND CASUALTY CO. v. BOARD OF WATER COM'RS OF CITY OF DUNKIRK et al.

### No. 267.

Circuit Court of Appeals, Second Circuit.
Aug. 9, 1933.

For opinion in connection with interlocutory decree below, see 43 F.(2d) 418.

Gibbons & Pottle, of Buffalo, N. Y. (Frank Gibbons, of Buffalo, N. Y., and George F. Cushwa, of Baltimore, Md., of counsel), for complainant-appellant.

J. L. Hurlbert, of Dunkirk, N. Y. (Samuel L. Drago, of Dunkirk, N. Y., of counsel), for appellant Merchants' National Bank of Dunkirk.

Arthur B. Towne, of Dunkirk, N. Y. (Thomas P. Heffernan, of Dunkirk, N. Y., of counsel), for appellee Board of Water Com'rs.

Glenn W. Woodin, of Dunkirk, N. Y., for appellees W. M. Pattison Supply Co. and others.

Thomas P. Heffernan, of Dunkirk, N. Y., for appellees Norwood Engineering Co. and others.

Wm. S. Stearns, of Fredonia, N. Y., for appellee Estate of Arthur L. O'Connell.

Stanley & Gidley, of Buffalo, N. Y. (Arthur E. Otten, of Buffalo, N. Y., of counsel), for appellee Warsaw Elevator Co.

Shire & Jellinek, of Buffalo, N. Y. (Edward L. Jellinek and Joseph Swart, both of Buffalo, N. Y., of counsel), for appellee Buffalo Steel Co.

Locke, Babcock, Hollister & Brown, of Buffalo, N. Y. (H. W. Huntington, of Buffalo, N. Y., of counsel), for appellee United States Cast Iron Pipe & Foundry Co.

Joseph C. White, of Dunkirk, N. Y. (Thomas P. Heffernan, of Dunkirk, N. Y., of counsel), for appellees McMachan and others.

Elton D. Warner, of Dunkirk, N. Y. (Thomas P. Heffernan, of Dunkirk, N. Y., of counsel), for appellee American Locomotive Co.

Penney & Penney, Wilcox & Van Allen, and Ladd, Garono & Jaeckle, all of Buffalo, N. Y. (E. H. Farnham, of Buffalo, N. Y., of counsel), for other appellees.

Before MANTON, L. HAND, and SWAN, Circuit Judges.

SWAN, Circuit Judge.

The board of water commissioners of the city of Dunkirk, a municipal corporation hereinafter referred to as the board, entered into two contracts with Loyd Contracting Company, hereinafter referred to as Loyd, for the construction of a filtration plant and a clear water basin. The contract for the filtration plant was dated April 20, 1926, and the contract price was $136,900; that for the clear water basin was dated August 12, 1926, and the price was $14,000. Bonds in like amounts for the faithful performance of the respective contracts were executed by the complainant, the Maryland Casualty Company, hereinafter referred to as the surety. The condition of each bond is that the principal shall faithfully perform the contract, and save the board harmless from damages arising out of any default, and pay all laborers and materialmen. When Loyd applied to the surety for these bonds, Loyd assigned to the surety all interest in the moneys to be received under the contracts. This assignment was not recorded. Subsequently Loyd made

another assignment of its interest in such moneys to Merchants' National Bank of Dunkirk, hereinafter referred to as the bank, to secure notes given by Loyd for money borrowed for the prosecution of work under the contracts. The bank's assignment was forthwith recorded.

In the summer of 1927 and after part of the work under the contracts had been performed, Loyd became in default, and the board passed a resolution terminating Loyd's employment, taking possession of the property, and calling upon the surety to proceed to complete the contracts. This it did, making a contract with the Pitt Construction Company, hereinafter referred to as Pitt, to complete the work. In July, 1928, the work was completed and accepted by the board, which has nearly $47,000 on hand representing money retained and unpaid on the contracts. Of this sum, about $19,000 represents percentages retained at the time of the termination of Loyd's employment. The cost to the surety of completing the contracts was more than $47,000.

In September, 1927, this suit was commenced by the surety. Numerous liens had been filed with the board on account of labor and materials furnished to Loyd, and these lien claimants, as well as Loyd, the board, and the bank, were made parties defendant. Another class of defendants are those who filed no mechanics' liens but who claim the right to recover from the surety under the terms of its bonds. The court below held that both classes of claimants were entitled to be paid the amounts found due them respectively out of the $47,000 retained by the board. They were given also a decree against the surety for any deficiency. Any surplus of the fund was awarded to the surety. The bank was held entitled to retain $7,067.83 paid to it by the board on July 2, 1927, by reason of the above-mentioned assignment given to the bank by Loyd, but the bank's claim to recover a large additional sum was postponed until after the surety was reimbursed. Loyd was decreed to pay the surety whatever the latter may pay under the decree.

The various questions raised by this appeal and the facts upon which they rest will sufficiently appear in the course of this opinion. Most of the questions were considered by the District Court in an opinion rendered in connection with its interlocutory decree. See (D. C.) 43 F.(2d) 418.

I. First will be considered issues between the surety and the board. The surety contends that the fund of nearly $47,000 payable by the board should be largely increased on account of (a) extra excavation, (b) extra filling, and (c) overpayments made to Loyd. There are also other matters in dispute, which will be dealt with seriatim.

■ (a) Extra Excavation. The plans and specifications upon which Loyd made its bids showed approximate rock levels which were found to be erroneous in that in many places the rock was considerably below the grade indicated on the plans. This necessitated extra excavation, which the surety contends increased the expense for the filtration plant by $25,000 and for the clear water basin by $6,300. It admits a payment of $569.60 for such extra excavation and claims the balance, amounting to $30,730.40. In pressing its claim the surety relies upon the principles declared in such cases as United States v. Spearin, 248 U. S. 132, 39 S. Ct. 59, 63 L. Ed. 166; United States v. Atlantic Dredging Co., 253 U. S. 1, 40 S. Ct. 423, 64 L. Ed. 735; United Construction Co. v. Haverhill, 9 F.(2d) 538 (C. C. A. 2); Pitt Construction Co. v. City of Alliance, 12 F.(2d) 28 (C. C. A. 6); Faber v. City of New York, 222 N. Y. 255, 118 N. E. 609; McGovern v. City of New York, 202 App. Div. 317, 332, 333, 195 N. Y. S. 925, approved on appeal in 235 N. Y. 275, 277, 139 N. E. 266. But we do not understand that these authorities include a case where, in the absence of fraud, negligence, or peculiar knowledge by the owner, the contract specifically covers the possibility of mistake and makes provision for that eventuality. See Foundation Co. v. State of New York, 233 N. Y. 177, 135 N. E. 236; Christie v. United States, 237 U. S. 234, 249, 35 S. Ct. 565, 59 L. Ed. 933; Faber v. City of New York, 222 N. Y. 255, 259, 261, 118 N. E. 609. Such is the case here. Paragraph 4 of the specifications states that the drawings show "approximate grades for excavation"; paragraphs 9 and 11 make provision for extra work generally and for changes or corrections in the plans; while paragraph 25 deals specifically with extra excavation. It provides that excavation must be carried to "grades shown on the plans, or to such increased depth as may be necessary to obtain a firm foundation"; and that "an extra allowance will be made for any extra excavation beyond that required by the plans * * * and this extra excavation will be paid for per cubic yard at the price bid upon under that item." Loyd had bid $2 per cubic yard for extra excavation, and prior to bidding had had an opportunity, which it had exercised so far as it desired, to inspect the site and make test borings. Right-

734

ly, we think, the District Court construed paragraph 25 as controlling. That the parties construed it in the same way is practically demonstrated by the fact that after the mistake had been discovered in the plans for the filtration plant, the same provisions and bid for extra excavation were repeated in the plans and specifications for the clear water basin.

■ (b) Extra Filling. The specifications required Loyd to place an embankment about the structures and on one side this extended down to Lake Erie. On that side dirt was loosely piled but not placed by Loyd in accordance with the specifications. On December 8, 1927, an extraordinarily severe storm on Lake Erie washed away a considerable portion of this dirt. It had to be replaced, and for this extra expense the surety claims $3,710, contending that the plans were defective in not calling for a retaining wall. In support of this contention reliance is placed on the fact that after the storm the board's engineer ordered sheet piling to be put in. This does not, however, necessarily compel the inference that the original plans were defective. There is conflict in the testimony as to whether any dirt was washed out before the December storm. Harshbarger, Pitt's engineer, mentions two washouts, but the board's engineer testified to the contrary, and is apparently supported by Loyd and Sturup. Since the pile of dirt had not been placed in accordance with the specifications, and since the December storm was of such unusual severity, we do not think the washout and the subsequent use of sheet piling was proof that the plans were defective. Hence the District Court's finding that the board is not responsible for the expense of the extra filling is sustained. Tompkins v. Dudley, 25 N. Y. 272, 82 Am. Dec. 349; Booth v. Spuyten Duyvil Rolling Mill Co., 60 N. Y. 487; Norton v. Fancher, 92 Hun, 463, 36 N. Y. S. 1032.

(c) Overpayments to Loyd. The contracts provided for monthly payments as the work progressed of "85% of the value of the work performed and material furnished for said improvements based upon the estimate of the Board's engineers." The remaining 15 per cent. was to be retained and final payment of the retained percentage was to be made "after all legal and equitable deductions are made," one month after acceptance of the whole work by the board and its engineers. The surety contends that the fund in the hands of the board should be augmented by some $9,500 representing overpayments to

Loyd, either before the work had been done, or before the due date had arrived. There is no provision making the engineer's estimates conclusive. It is not argued that this is implicit, so we shall assume it is not, at least where we find errors gross in character going not so much to the judgment of the engineer as to his computation. The District Court found that the board's engineer had made his estimates in good faith and that no overpayment was proved. Our inquiry goes to whether there is evidence to support this finding in the particular instances where an overpayment is claimed. Apparently what Kesner, the board's engineer, tried to do was to accept Loyd's apportionment of its gross bid as to each item, say concrete, and to estimate how much of it had been performed. Each such item Kesner allowed only to the extent of 85 per cent., holding back 15 per cent. and the whole of the unperformed part of that item. Whether in fact he pursued this consistently must be considered.

On Kesner's certificates the board paid 85 per cent. for concrete poured, before its surface had been finished. Nothing was reserved for surface finishing and there are no figures as to the cost thereof save the surety's, which were $3,501.37. Since Loyd took the contract for about 25 per cent. below the cost of construction (fol. 1615), we shall adjust the surety's cost figures accordingly, taking it that there was an overpayment here of 75 per cent. of the surety's estimate, or $2,626.03.

There is a dispute between Kesner and the surety's witnesses as to the concrete yet to be poured. The surety claims an overpayment of $2,700. Kesner testified that with the machinery on the ground the cement could be put in for $11 a yard and that fifty-six yards remained. The price is low but not impossible at Loyd's figures. The quantity is also rather low but we take it the judge believed Kesner and that the $630 reservation for this item covered it. The claim for this item is disallowed.

Kesner attempts to put items for further excavation, removal of an old pump station, cast-iron pipe, and steel for covering the settling basin under $400 reserved for pump suction plus $50 reserved for piping. This is unlikely but not impossible of credence. As to the funds which should have been reserved, Kesner's figure on the steel was $90. For the removal of the old station, the cast-iron pipe, and the excavation Kesner had no figures, so, as in the case of the unfinished concrete, we must take three-quarters of the surety's figures to adapt them to Loyd's.

Steel .............................$ 90
Old station, ¾ of $200.............. 150
Cast iron pipe, ¾ of $240............ 180
Excavation, ¾ of $800.............. 600
————
Total ........................$1020
Allowance ..................... 450
————
Overpayment ..................$ 570

Kesner reserved $50 for wood baffles and testified that at Loyd's prices they would cost $135 plus about $200 for labor. Taking him at his word, the overpayment was $285. (For comparison, 75 per cent. of surety's figure would be about $650.)

Kesner said it would cost $90 (three-quarters of surety's figure would be $375) to place earth over the settling basin and that it came under grading for which $650 was reserved. Inasmuch as the evidence does not show how much more grading was to be done, no overpayment was proven.

Similarly no overpayment is proved as to the stone coping. Kesner says this is really artificial stone coping, therefore to come under the concrete allowance. It is not shown that that was not included in the unpoured concrete allowance discussed above.

Kesner claims that the lumber needed was on the ground fortifying his contention with impressive photographs. The testimony of the surety's witnesses indicates they bought lumber rather than rush the removal of the forms from the poured cement. We must take it the court below believed Kesner's story.

Kesner testified fifty tons of extra steel was purchased because of a change in the clear water basin plan permissible at the contractor's option. Twenty dollars a ton was a liberal allowance but not unreasonably so. Therefore, the evidence supports the finding of no overpayment.

In regard to the outside face brick item, Kesner's testimony that this justified the allowance of $1,000 more than if ordinary brick were used also supports the finding.

■ The total overpayment we have found is $3,481.03. We believe that the fund in the hands of the board should be increased by this amount because the surety sustained damage in that these overpayments reduced the retained percentages which should have been available on completion of the contracts. National Surety Co. v. Board of Education, 15 F.(2d) 993 (C. C. A. 4).

■ (d) Completion of Contracts by Surety. The District Court found that the surety elected to complete the contracts of its principal and did complete them. This finding is challenged by the surety, its contention being that the board entered into a new agreement with it for finishing the work and thereby released it from all liability upon its bonds. The contention is not supportable. The resolution of July 28th, though it terminated the "employment" of the contractor, called upon the surety to proceed to finish the contracts. Inconclusive negotiations followed, and then came the board's resolution of August 25th, which recited that the surety was completing the work and that the board would pay as the work progressed, retaining 15 per cent. until final completion. There can be no doubt that when the surety undertook to do the work it did so for its own protection as surety, and not under an independent contract with the board.

■ (e) Deduction for Delayed Completion. The time for completion of the work by the contractor expired June 16, 1927, and the contracts provided that in case of delay the board might deduct from payments due the sum of $20 per day as liquidated damages to cover the cost of extra engineering and other expense caused by the delay. The work was not completed until July 3, 1928, which is said to be 339 days late. The board incurred an extra expense for engineering during this period of $5,085, and the decree authorized the deduction of this sum from the moneys payable to the surety by the board. It is urged that the liquidated damage clause applies only when the contractor completes the work tardily, and not when he abandons it. See Gallagher v. Baird, 54 App. Div. 398, 66 N. Y. S. 759, affirmed 170 N. Y. 566, 62 N. E. 1095; Murphy v. U. S. Fidelity & G. Co., 100 App. Div. 93, 91 N. Y. S. 582, affirmed 184 N. Y. 543, 76 N. E. 1101. Since completion of the contracts was taken over by the surety, perhaps the provision would include tardy completion by the surety no less than by the contractor. But this need not be decided, for the claim is not for liquidated damages but for smaller actual damages incurred for engineering services necessitated by the contractor's default. Against damages arising out of the contractor's default, the bonds expressly provided indemnity to the board. Deduction of the item was properly allowed.

(f) Claim for Materials Furnished by the Board. This will be discussed hereafter in connection with the claims of other claimants who supplied labor or materials.

■ II. We pass now to issues between the surety and claimants who furnished labor and materials to the contractor. Some of these

**736**

claimants were held to have established statutory liens upon the fund in the hands of the board, others were held not to have such liens, but all were given priority over the surety in respect to payment out of the fund. The surety disputes their priority.

In Arrow Iron Works, Inc., v. Greene, 260 N. Y. 330, 183 N. E. 515, it was held that a surety who completes the contract of its principal is entitled to come ahead of statutory lienors in respect to moneys unearned by the principal at the time of his default. Under the New York Lien Law (Consol. Laws, c. 33) § 5, the lien, like an assignment, only attaches to money due the contractor; money unearned at default was not so due, and the Court of Appeals regarded it as equitable to give it to the surety whose efforts in completing the contract had made it fall due. All but about $19,000 of the fund held by the board was "unearned money," as to which the surety would have priority under the principle of the Arrow Case, were it not for the contractual liability which the surety assumed by the condition of its bonds. The bonds required payment of "all laborers employed in work on or about" the improvement and payment for "all material furnished in or about" such improvement. This is equivalent to a promise to the board to pay laborers and materialmen, which promise the board may enforce for their benefit. Johnson Service Co. v. E. H. Monin, Inc., 253 N. Y. 417, 171 N. E. 692, 77 A. L. R. 214; Corbin, Contractors' Surety Bonds, 38 Yale L J. 1. Compare Fidelity & Deposit Co. v. Hay, 9 F.(2d) 749 (C. C. A. 3). Therefore if the unearned moneys were to be paid to the surety, it would forthwith be compelled to pay to the board for the use of the labor and material claimants the amounts found due them. Hence the question of priority between the surety and such claimants in respect to payment out of the "unearned" moneys held by the board is really academic. The District Court properly directed the board to pay "unearned" moneys to the claimants, whatever might be the rights of the surety were it not for its contractual liability.

An attempt is made by the surety to distinguish the Monin Case because there a statute made mandatory the taking of a security bond, while here the board was not obliged to exact a bond. But as the statute did not prescribe the terms of the bond, or require security to be taken for the benefit of persons furnishing to the contractor labor or materials, the relevancy of the statute is not apparent. There, as here, the terms of the bond were determined by the discretion of the promisee. We regard the Monin Case as controlling. See Fed. Surety Co. v. City of Staunton, Ill., 29 F.(2d) 9, 11 (C. C. A. 5).

The priority of the surety as to "earned" money, that is, money representing the retained 15 per cent. of work completed at the time of default, was not decided in the Arrow Case because the surety there made no claim to "earned" money. But the logic of the decision as to "unearned" money extends also to "earned" money, and such we believe to be the law of New York as well as the federal law. Laski v. State of New York, 217 App. Div. 420, 217 N. Y. S. 48, affirmed 246 N. Y. 569, 159 N. E. 655, which is strongly relied upon for the contrary view, can have little vitality after the Arrow decision. As to "earned" money the surety has been given priority over an assignee of the contractor by the great weight of authority. Prairie State Nat. Bank v. United States, 164 U. S. 227, 17 S. Ct. 142, 41 L. Ed. 412; Henningsen v. U. S. Fidelity & G. Co., 208 U. S. 404, 28 S. Ct. 389, 52 L Ed. 547; Hardaway v. Nat. Surety Co., 211 U. S. 553, 29 S. Ct. 202, 53 L. Ed. 321; Lacy v. Maryland Casualty Co., 32 F. (2d) 48, 51 (C. C. A. 4); 45 A. L. R. 379, note. As stated in the Lacy opinion, the surety upon completion of the contract is subrogated to all rights of the obligee (owner) as against the principal, and since the owner upon the principal's default is entitled to apply all retained moneys toward performance of the contract, the surety by subrogation gets the same right so far as necessary to reimburse his loss. The retained percentages are regarded as security to the owner for completion of the contract, and to this security the surety is subrogated when he performs the principal's obligation by completing the work.

It is true that the cases above cited dealt with assignees and that the money advanced by them was not traced into labor or material used in the work. Where it is so traced the assignee urges that, like a lienor, it is in a stronger position than a mere assignee to urge an equity superior to the surety since this labor or material may be said to have created the fund the surety is claiming. The argument has been rejected as to assignees whose loans were traced into the work. Farmers' Bank v. Hayes, 58 F.(2d) 34 (C. C. A. 6); Ohio ex rel. Southern Surety Co. v. Schlesinger, 114 Ohio St. 323, 151 N. E. 177, 45 A. L. R. 371; but cf. American Surety Co. v. Bellingham Nat. Bank, 254 F. 54 (C. C. A. 9). Nor does the more direct claim of the materialman or laborer fare better. Tuttle v. Independent School-District, 62 Iowa, 422, 17

N. W. 603; St. Peter's Catholic Church v. Vannote, 66 N. J. Eq. 78, 56 A. 1037. We share the view that the argument is not well founded. Had the owner completed the contract he was privileged to apply the retained percentages to make good his loss despite the fact that they were created by the goods and labor of the lienors. Only to the extent that the owner's loss exceeds the moneys retained, both earned and unearned, would the surety be liable. The surety should suffer no greater loss because it voluntarily completes the work instead of compelling the board to complete it and sue for the loss thus caused.

■ But as to "earned" moneys no less than unearned, the question of priority between surety and claimant is academic in so far as the claimant is protected by the surety's promise to pay for labor and materials. Consequently it seems unnecessary to determine the validity of liens allowed to certain of the claimants, although the validity of some of such liens is disputed by the surety. The lien claimed by Schriber Sheet Metal Company will be discussed hereafter.

The decree, it is true, awarded claimants having liens priority in payment out of the fund over nonlien claimants; but as none of the latter has appealed, we are not concerned with the correctness of the court's ruling as to the order of their payment. All of them come ahead of the surety because of its contractual liability, and the order of payment as between themselves is immaterial on the surety's appeal.

With respect to certain of the claimants the surety makes specific objection, either that the claim is not within the class of claims which it promised to pay, or that the claim has been allowed in too large an amount. These specific objections will now be considered.

■ Claim of C. F. Shinners for $199.36. Between November 1, 1926, and July 20, 1927, the claimant furnished Loyd gasoline, grease, alcohol, and a tire and tire chain for an automobile truck, and performed services in repairing the tires and greasing the truck. For such material and services no lien could be obtained under the New York Lien Law, which distinguishes between materials actually applied to and consumed in the work and materials consumed in machines operating on the work. Shultz v. C. H. Quereau Co., 210 N. Y. 257, 104 N. E. 621, L. R. A. 1915E, 986, Ann. Cas. 1915B, 965. The Lien Law (section 5) uses the phrase material "furnished to the contractor," while the bond now under consideration requires payment for material "furnished in or about" the improvements. Had the bond used the exact statutory phrase it would have been construed with the same limitations as the statute. Standard Oil Co. v. Fed. Surety Co., 28 F.(2d) 489 (C. C. A. 8). We do not think this slight difference in phraseology is significant of an intent to include within the surety's contractual liability classes of material not within the Lien Law. Certainly it seems clear that the purchase price of a truck used on the work would not be within the phrase "material furnished in or about" the work. Materials to operate the truck reasonably fall in the same category in view of the accepted construction of the Lien Law. If it was intended to provide otherwise, more definite language should have been chosen. This claim is disallowed.

■ Claim for Wemlinger Company for $1704.31. This is for rental of a steam hammer. Such a claim is not lienable. Troy Public Works Co. v. City of Yonkers, 207 N. Y. 81, 100 N. E. 700, 44 L. R. A. (N. S.) 311. It is governed by the same considerations discussed under the claim of Shinners, and is likewise disallowed.

■ Claim of the Board for $319.54. This is for steam to operate machines, for labor in the board's plant to generate the steam, and for supplying repairs to indefinitely described machines. Under the principles discussed in the two preceding claims, this claim is disallowed.

■ Claim of United States Cast Iron Pipe Company. The pipe company claims $15,085.14 for materials furnished Loyd. The surety contends that this was paid by two checks aggregating $14,000 when the claim amounted to about $11,000, the remainder of the claim being interest that has since accrued. When the shipments to Loyd at Dunkirk started, $68,000 was owing to the pipe company. The first shipment on May 26, 1926, was paid for by a check specifically allocated to the Dunkirk job by Loyd. Therefore it need not figure in our computations. Further shipments increased the account by some $11,000, whereas general credits against the account were made prior to August 30, 1926, of about $21,500, and thereafter as follows: On September 17, 1926, a general credit of $9,000 by the pipe company to Loyd account; on October 22d, another of $3,000; on November 22d, a further general credit of $5,000 occurred. The credits of October 22d and November 22d are those that the surety contends should extinguish the claim. These payments were made by two checks drawn by

Loyd on the Merchants' National Bank of Dunkirk. Both payments were made before any liens were filed, so that the question as to any rights of lienors is not present here. The debtor attempted to make no application of these checks to the Dunkirk debt nor did the pipe company specifically apply them to the prior debt, merely to the running account. Under the familiar rule of applying payments to the oldest items of the account, these checks would be absorbed by the old rather than the Dunkirk debts. We think this rule should be followed here. Sheppard v. Steele, 43 N. Y. 52, 3 Am. Rep. 660. See Thompson v. St. Nicholas Nat. Bank, 113 N. Y. 325, 333, 21 N. E. 57. Compare National Surety Co. v. Western Pacific R. Co. (C. C. A.) 200 F. 675; National Park Bank v. Seaboard Bank, 114 N. Y. 28, 20 N. E. 632, 11 Am. St. Rep. 612; Nostrand v. Ditmis, 127 N. Y. 355, 28 N. E. 27. Indeed, it has been held that a general credit to a running account is the equivalent of an election by the creditor to apply the payments to the extinguishment of the earlier items. Jones v. United States, 7 How. 681, 12 L. Ed. 870. The surety contends that equity demands that the payment absorb the Dunkirk debt. We do not think that this equity which arises not between debtor and creditor, but rather, unknown to the creditor, between the debtor and a third person, is sufficient to justify a disregard to the creditor's detriment of the understood effect of a general credit against a running account. None of the authorities cited by the surety requires a different holding. This claim is allowed.

■ Claim of H. Schriber Sheet Metal Company. This claimant had a contract with Loyd for sheet metal and slate roofing at a price of $4,664. Slate of the value of $1,000 was delivered. The remainder of the material was specially manufactured and ready for delivery but not delivered before Loyd defaulted. Thereafter the manufactured material was sold to Pitt for $1,728. Credit was given Loyd for this sum and for an additional $500 item, leaving a balance of $2,436 for which the claim was allowed as a lien. They were lienable under sections 9 (4) and 12 of the Lien Law, which expressly provides for "materials actually manufactured for but not delivered"; but the surety contends, and we think rightly, that they were not "material furnished in or about" the work within the surety's contractual liability.

Accordingly as a nonlien claimant, the Schriber Company is entitled to only $1,000. The validity of its lien for any sum is challenged on the ground that its subsequent sale to Pitt was an abandonment of its lien and an election to make a claim against Loyd for damages. See North American Iron Works v. G. De Kimpe, Inc., 232 App. Div. 579, 251 N. Y. S. 144. This contention would seem to be correct; but in any event, as we have held the surety prior to such a lienor as to moneys retained by the board, the claim can be allowed only to the extent of $1,000.

Claim of Blood et al., Administrators of Arthur L. O'Connell, Claimant. This claim consisted of two parts: $307 for materials manufactured but not delivered, and the remainder amounting to $396.94 for that furnished and installed. The first part of the claim falls as did Schriber's. The second is allowed.

■ Claim of Oliver W. Dice. Dice's claim was for $565.53 for "money advanced" to pay for materials for the work. There is no provision in the bond requiring the surety to pay lenders of money, so the claim fails. The supply of money does not constitute "furnishing materials." Uvalde Asphalt Paving Co. v. City of New York, 191 N. Y. 244, 84 N. E. 83; Knickerbocker Portland Cement Co. v. State of New York, 218 App. Div. 22, 217 N. Y. S. 652.

III. We turn now to issues between the surety and the bank. Two separate matters are involved: The first relating to a payment of $7,067.83 made by the board to the bank on July 2, 1927, which the surety seeks to set aside; the second, to the bank's claim that it should be allowed some $16,000 out of the "earned" moneys held by the board.

■ On November 16, 1926, Loyd assigned to the bank moneys to become due under its contracts as security for loans made and to be made. The assignment was duly recorded and nine payments were made by the board to the bank prior to July 1, 1927. None of these is contested. On July 2, 1927, the board delivered to the bank a warrant and voucher for $7,067.83. This represented money due to Loyd for work performed and was part of the 85 per cent. payable according to the engineer's estimate. The bank did not sign the voucher until July 8th and did not at once place it to Loyd's credit, but carried it in the cashier's account. Some part of it the bank had agreed to pay out for Loyd's pay roll and it did use $3,000 in this manner. The remainder was then credited against a note of Loyd. Apparently the surety contends that the transaction was a payment to the bank on July 8th and that the bank was then charged with notice of Loyd's impending failure. Even if this were proved, though it does

not seem to be, the bank's assignment would protect it in accepting payment. It was twenty days before a default was declared by the board. The bank had no notice of the prior unrecorded assignment to the surety, and therefore we see no basis for asserting that the surety had a prior equity in payments due to Loyd under the terms of the contract. The District Court was correct in allowing the bank to retain this payment.

Of sums loaned by the bank to Loyd the amount of $16,352 was used by Loyd to pay for labor and material and was thus traced into the work. To this extent the bank claims to be entitled to payment out of the "earned" moneys in priority not only to the surety but also to the lienors. From what has been said above in discussing priorities between the surety and lienors, it is apparent that the bank by reason of its assignment alone ranks behind the surety. Here it traces its money into the work and claims a superior equity for that reason. We have held above that this makes no difference. Farmers' Bank v. Hayes, supra, 58 F.(2d) 34 (C. C. A. 6); State ex rel. Southern Surety Co. v. Schlesinger, supra, 114 Ohio St. 323, 151 N. E. 177, 45 A. L. R. 371.

In the respects indicated in the foregoing opinion the decree is modified, and so modified, it is affirmed. One-fifth of the surety's costs on appeal are awarded against the board; otherwise each party is to bear his own appellate costs.