FRANKLIN A. SNOW COMPANY *vs.* COMMONWEALTH.

Suffolk.   November 15, 16, 1938. — July 7, 1939.

Present: FIELD, C.J., DONAHUE, LUMMUS, & DOLAN, JJ.

*Contract*, What constitutes, Construction, Building contract.

Under provisions of "information for bidders" for a contract for a public work that the "party to whom the contract is awarded" must furnish the usual public contractor's bond and execute the contract and bond within a specified time, no contract was made until execution and delivery of the bond and the contract.

A contractor performing a public work was not entitled to recover for extra expense caused by his being unable to use as a source of rock a quarry which had been approved by the engineer in charge and was believed by both the engineer and himself to be available for use before he submitted his bid accompanied by his certified check which was subject to forfeiture if he failed to execute the contract, where it appeared that the contract did not warrant that quarries approved by the engineer would be available to the contractor, and that both he and the engineer learned twenty days before the con ract was executed that such quarry was not available and that another source for rock would have to be found.

Where a contract for a public work provided that "the planimeter shall be considered an instrument of precision adapted to the measurement of" areas, that earth excavation should "be measured in place before excavation," and earth embankments should be "measured in position after compacting," an acceptance by a judge of planimeter measurements instead of a computation by an auditor, whose findings were to be final, in accordance with a count of truck loads found by him to be a method more accurate than that by planimeter, was warranted.

PETITION, filed in the Superior Court on March 5, 1937.

The case was heard by *T. J. Hammond*, J.

*J. F. Morgan*, for the petitioner.     '

*E. O. Proctor*, Assistant Attorney General, for the Commonwealth.

LUMMUS, J.   This is a petition under G. L. (Ter. Ed.) c. 258 by a contractor which constructed the east branch baffle at the site of Quabbin Reservoir in the towns of Greenwich and Hardwick in 1936 and early in 1937. It was referred to an auditor whose findings of fact were to be final.

G. L. (Ter. Ed.) c. 258, § 2. Upon his report the judge ordered a final decision in favor of the petitioner for only $7,554.72, exclusive of interest. The only questions now raised concern items K and L of the petition, in which the petitioner claimed $136,625 and $31,535.69 respectively, and upon which the auditor reported that the petitioner was entitled to $118,131.76 and $15,676.70 respectively, but upon which the judge decided for the respondent. The case comes here on the petitioner's appeal under G. L. (Ter. Ed.) c. 231, § 96. *Royal Paper Box Co.* v. *Munro & Church Co.* 284 Mass. 446, 449. *Robinson* v. *Lyndonville Creamery Association,* 284 Mass. 396, 398. *Kamberg* v. *Springfield National Bank,* 293 Mass. 24, 25. *Edinburg* v. *Allen-Squire Co.* 299 Mass. 206.

Item K is for "additional expense incurred over the original estimates, figures and bid prices caused by a change in the quarry site from the original designated quarry site to the site chosen after the award of bids together with damages caused by delay in getting stone from the second quarry $136,625.00."

The essence of the claim is that the contract contemplated the use by the petitioner of the Parker quarry, located within the territory to be flooded by the dam, as a source of broken stone or riprap which the contract required the petitioner to procure and use in large quantities, but that the use of that quarry proved impossible because the Commonwealth did not own it and failed to take it by eminent domain, and the petitioner had to resort to another quarry where the cost of procuring and transporting the material was very much greater.

An important point is the date of the contract between the petitioner and the Commonwealth, the latter acting by its metropolitan district water supply commission.

A form of contract was presented to prospective bidders, preceded by "information for bidders," which stated among other things that the sealed bids or proposals would be publicly opened and read on May 14, 1936. "As a guaranty of the good faith of the bidder, each bid must be accompanied by a certified check acceptable to the commission and pay-

able to the Commonwealth of Massachusetts, for ten thousand dollars ($10,000), such check to be returned to the bidder unless forfeited under the condition herein stipulated." The "party to whom the contract is awarded" was to furnish a bond with surety for the faithful performance of the contract and the payment for all labor performed or furnished and for all materials used or employed in the carrying out of the contract. "The party to whom the contract is awarded will be required to present forthwith to the commission the name of the surety to be offered, and to execute the contract and the bond" within ten days after being notified that the contract is ready for execution; "and, in case of his failure or neglect to do so, the commission at its option may determine that the bidder has abandoned the proposed contract, and thereupon, if it so determines, the proposal and acceptance shall be null and void, and the check accompanying the proposal shall be forfeited to the Commonwealth as liquidated damages."

The form of contract which followed the "information for bidders" and the "proposal" containing the bid, signed by the petitioner, described the work and the terms upon which it should be done. Section 10´ provided: "Land and rights of way of the Commonwealth are provided by the commission for the purposes of this contract to the extent shown on the plans, or on other plans on file in the office of the engineer; and the contractor will not be required to enter or build upon any other land, until the necessary additional land or rights of way have been provided." Section 14 provided: "The contractor may, without charge therefor, open quarries, gravel, sand, soil, or other borrow pits on the lands controlled by the commission at any places permitted by the engineer, but unless shown on the plans or specifically permitted may not borrow from any area above" elevation 530. The work required both "stone fill" (Item 8), estimated at ten thousand cubic yards, and "riprap" (Item 9), estimated at fifty thousand cubic yards. The petitioner's bid for each was $1 a cubic yard, for furnishing "all materials, equipment and labor required to construct" the stone fills and

riprap called for by the plans. In general, the same sorts and sizes of stones may be used for both. Section 8.2 of the contract provided that "satisfactory rock from open quarries located as approved may be used in the construction of stone fills." The word "approved" means "approved by, or acceptable or satisfactory to, the engineer . . . ." The "engineer" means "the person holding the position or acting in the capacity of chief engineer of the metropolitan district water supply commission with respect to the work covered by this contract, acting either directly or through properly authorized agents, such agents acting within the scope of the particular duties entrusted to them." No similar provision appears as to obtaining rock from quarries for "riprap"; but the material required is so similar that a similar provision may possibly be implied.

On May 6, 1936, the petitioner's representatives went over the information to bidders, the proposals, and the form of contract, and inspected the location, accompanied by one O'Malley, who for the purposes of the contract was the "engineer" authorized to designate "approved" quarry sites and borrow areas. He showed the petitioner's representatives the Parker quarry, and told them that the Parker quarry was approved as a source of rock for stone fill and riprap, and that the quality of the rock made it suitable. The petitioner examined no other quarry before bidding. "The Parker quarry site is within the area which will be submerged but projects above the floodline at elevation 530 so that it will above that line constitute an island in the proposed reservoir." O'Malley believed that the Parker quarry was on land then owned by the Commonwealth, and so did the petitioner. Nothing on the plans indicated the contrary.

On May 14, 1936, the petitioner submitted its bid, with the required certified check, and later on the same day was notified that it was the lowest bidder. On May 19, 1936, the petitioner's representatives proposed to O'Malley and a superior of his a method of using the Parker quarry, and they approved the method proposed, and thereby approved the use of the quarry. On May 28, 1936, the commission

awarded the contract to the petitioner, subject to the execution and delivery of a contract and a surety bond, and to the approval of the Governor and Council. It is contended that no such approval was required by law; but it was obtained on June 23, 1936. At any rate, the award was subject to the execution and delivery of the contract and bond; and these were not executed and delivered until June 23, 1936.

The fact that the Commonwealth did not own the Parker quarry first became known to O'Malley and his official superior, and to the petitioner, on June 2, 1936, from information given by one Walker, the custodian of the property of the Commonwealth in that locality. The auditor finds: "Peabody [O'Malley's superior] became perturbed on hearing this, but left the impression with the . . . [petitioner] that he would get the property for it right away. O'Malley also stated at this time he would do all he could to get the site for the . . . [petitioner]. Neither . . . took any steps or made any attempt to secure the Parker site for the . . . [petitioner]. As a matter of fact after conveying the impression to the . . . [petitioner] that the site would be available they allowed the . . . [petitioner] to work from June 23rd, the date the contract was signed, until June 30th, before they definitely told the . . . [petitioner] they could not use the Parker site." The auditor finds that the petitioner "would not have submitted a bid had it known the Parker quarry would not be available for its use."

By the contract, reading §§ 14 and 8.2 together, the only quarries or borrow pits to be used as of right by the contractor were those situated "on the lands controlled by the commission," and then only those "permitted" or "approved" by the engineer. In terms, the provision of paragraph 8.2 only permits the use of rock from approved quarries, and does not warrant or agree that such quarries shall be available. But assuming in favor of the petitioner that the approval of the Parker quarry would give the petitioner a contractual right to have it available for use if such approval entered into the contract or was done under

the contract, in the present case the contract was not signed until after it was well known that the approval could not, without further action, give the petitioner any right to use the quarry. Before the contract was signed, if the petitioner had been unwilling to sign it, there might have been a forfeiture of the petitioner's certified check which was deposited as a pledge of its willingness to execute the contract on request, and in a sum fixed as liquidated damages for any unwillingness. *Garcin* v. *Pennsylvania Furnace Co.* 186 Mass. 405. *Wheaton Building & Lumber Co.* v. *Boston,* 204 Mass. 218, 222, 223, 226. *John J. Bowes Co.* v. *Milton,* 255 Mass. 228, 233. *Daddario* v. *Milford,* 296 Mass. 92, 107 Am. L. R. 1447. But it was not intended that either party should be under any contractual obligation until the contract and bond should be executed, and that did not take place until June 23, 1936. *Edge Moor Bridge Works* v. *Bristol,* 170 Mass. 528. *Wheaton Building & Lumber Co.* v. *Boston,* 204 Mass. 218, 222. 1 Williston, Contracts (Rev. Ed.) §§ 28, 28A, 31. The case differs from *Duggan* v. *Matthew Cummings Co.* 277 Mass. 445, in a number of respects. See also *Rosenfield* v. *United States Trust Co.* 290 Mass. 210, 216.

The petitioner had no contract and no contractual obligations or rights before June 23, 1936. At that time it knew that the Parker quarry was not owned or controlled by the Commonwealth, and could not in the then existing state of things be effectively approved under the contract as a source for stone. It had a hope that the engineers would succeed in making the Parker quarry available; but that was no part of the contract, which was formal and completely written. It sought no escape from its bid or proposal on the ground of mistake or otherwise. When the petitioner voluntarily signed the contract under those circumstances, it took its chances of finding a quarry which would enable it to perform the contract without loss. The judge was right in deciding for the respondent as to Item K of the petition.

Item L of the petition is "for shortage of quantities supplied under contract and not credited by the engineers

$31,535.69." The various items of work were to be paid for by the unit, usually a cubic yard, and there was a dispute as to the number of units performed or furnished in various items. Item 3 of the contract provided for earth excavation at forty cents a cubic yard, and the auditor allowed the petitioner for one thousand, four hundred sixty-eight more cubic yards than it was paid for, or $587.20. Item 6 of the contract provided for pervious embankment at twenty cents a cubic yard, and the auditor allowed the petitioner for sixty thousand, three hundred twenty-five and one tenth more cubic yards than it was paid for, or $12,065.02. Item 7 of the contract provided for impervious embankment at fifty cents a cubic yard, and the auditor allowed the petitioner for four thousand, eight hundred forty-three and one twentieth more cubic yards than it was paid for, or $2,421.52. These three items, added, amount to $15,073.74.

The auditor found the quantities according to a count of truck loads taken by the petitioner, which he found to be a method of determining quantity which was nearer to accuracy than the methods adopted by the respondent, which involved the measurement and mathematical computation of the cubic contents of spaces to be excavated or filled, and the use of an instrument called the planimeter.

The contract provided that the engineer should decide all questions which might arise as to the quantity of the several kinds of work to be done or materials to be furnished under the contract, and that his determination and decision should be final and conclusive. It provided also: "For the estimating of quantities in which the computation of areas by analytic and geometric methods would be comparatively laborious, it is stipulated and agreed that the planimeter shall be considered an instrument of precision adapted to the measurement of such areas." As to earth excavation, the contract provided that the number of cubic yards should be "measured in place before excavation." As to both pervious and impervious embankments, according to the contract, the number of cubic yards were to be "measured in position after compacting." Measure-

ment by a count of loads was thus excluded as a means of determining what was due to the petitioner. *Morse* v. *Boston*, 253 Mass. 247, 254. Without relying on the provision for final determination by the engineer, it seems to us that the judge was right in holding the petitioner to the determination of quantities according to the contract, and in deciding for the respondent as to Item L of the petition.

The order for final decision is affirmed. Final decision is to be entered for the petitioner for $7,554.72 and interest. See *Charles I. Hosmer, Inc.* v. *Commonwealth*, 302 Mass. 495, 504.

*So ordered.*