STATE OF CONNECTICUT *v.* THE HARTFORD ACCIDENT AND INDEMNITY COMPANY ET AL.

MALTBIE, C. J., BROWN, JENNINGS, ELLS AND DICKENSON, JS.

Argued June 15—decided November 22, 1949.

*Thomas J. Conroy,* assistant attorney general, with whom, on the brief, was *William L. Hadden,* attorney general, for the appellant (plaintiff).

*Ernest W. McCormick,* with whom, on the brief, was *Frank Chapman,* for the appellees (defendants).

MALTBIE, C. J.   The state brought this action to recover the excess cost to which it had been put in constructing a section of highway by reason of the cessation of the defendant, the Deliso Construction Company, Inc., before fully performing a contract it had made for the work.   The state also made defendant the Hartford Accident and Indemnity Company, which had given it a bond conditioned upon the performance of the contract by the Deliso Company.   The latter company filed a counterclaim in which it sought to recover the reasonable value of the work it had

done, on the ground that it had rescinded the contract because of misrepresentations by the state officials in charge of the work. The court found the issues on the complaint for the defendants and on the counterclaim for the defendant Deliso Company, awarding it damages. The principal issue is: Was there such a misrepresentation as entitled it to rescind the contract? We shall hereinafter refer to the Deliso Company as the company.[1]

The facts stated in the finding present this situation: The state highway department advertised for bids for the grading and drainage of about 7400 feet of new highway. The work involved both excavation and fill. The company is a corporation with its principal office in Massachusetts; it had qualified as a contractor for the construction of state highways in Connecticut, but it had not previously done any work of that nature in this state. Its representative obtained from the highway department a set of plans for the proposed highway and copies of the standard specifications, special provisions and bid forms; he asked whether there was any other information available to bidders and was told there was not. Employees of the state had in fact made soundings at various places on the course of the proposed highway for use in estimating the excavation necessary and in determining the width of the required right of way. The soundings were made with iron bars, the longest of which was about ten and one-half feet, and rock or boulders had been encountered in several instances from two and one-half to nine feet below the

---

[1] The state brought the action by writ dated February 15, 1943. Thereafter the company was authorized by the General Assembly to sue the state on its claim. 24 Spec. Laws 287. The special authority so given was unnecessary. ". . . if the State itself invokes the jurisdiction of the court to secure affirmative relief, it subjects itself to any proper cross demand involved in the subject-matter of the action." *Reilly* v. *State,* 119 Conn. 217, 219, 175 A. 582.

surface; but the soundings were made in the deeper cuts and covered only a part of the course of the highway.

The plans consisted of forty-six sheets. They showed the general layout of the proposed highway, a profile of the surface of the land as related to it, an estimate sheet of the work to be done and cross-section drawings of the cuts necessary at the stations, located 100 feet apart. The plans embodied the results of the soundings made by the department, but they did not state that any soundings had been made. The estimate sheet had a column headed "Unclassified Excav.," giving a total of 125,983 cubic yards. On this sheet also was an item "Est. Rock Swell," 11,957 cubic yards; this item represented the estimated larger space which rock excavated during the course of the work would occupy when used as fill. Certain of the cross-section drawings contained a requirement for a two-foot subbase, which indicated that the cut was through rock; they showed steeper slopes to the sides than would be required for cuts through earth; and on one of the sheets was a reference to an exposed ledge. The standard specifications classify excavation as "Earth," "Rock," "Loam" or "Unclassified"; they define the latter term as including "any and all materials, other than water"; and the provision then goes on to state: "When no item of excavation other than unclassified appears on the proposal form, no compensation will be made under any of the other classifications given herein." The specifications also contained this provision: "The Bidder is required to examine carefully the site of the work, and the proposal, plans, special provisions, specifications and contract form for the work contemplated, and it will be assumed that he has judged for and satisfied himself as to the conditions to be encountered, as to the character, quality and quantities of the work to be per-

formed and materials to be furnished, and as to the requirements for these specifications and contract."

Representatives of the company inspected the site of the work. They examined the plans for the purpose of ascertaining what would be necessary as regards moving earth, the accessibility of the location, the amount of traffic interference, the depths of excavation and fill, distances of haul, and the like, but they made no detailed examination of grading computations or cross-section drawings, because the approximate quantities were set out in the estimates of work to be done; they did notice the item for rock swell but assumed that it represented broken stones and boulders; and they did not know that soundings had been made and assumed that if they had the fact would have been noted on the maps. They decided that the work would require only power shovels, trucks and bulldozers. The company, with other bidders, submitted a proposal to do the work upon a form supplied by the state highway department. The form recited that "an examination has been made of the Specifications and Contract Form, including the 'Special Provisions' contained herein, also of the plans and of the Site of Work;" and stipulated that the company would perform the work "in accordance with the Contract and Specifications and in conformity with the Plans and the requirements of the Highway Department" and that it would furnish a contract bond as security for the construction and completion of the project. On the back of the proposal sheet was a form on which the company stated the prices for which it would do the work; one item placed there by the highway department was "Unclassified Excavation," and opposite it, under the heading "Approximate Quantities" appear the figures, "c. y. 125,-983." Against this item the company wrote in a unit price of 29 cents per cubic yard and the amount of its

bid for this item, $36,535.07. The proposal was made on the basis of the excavation of earth or material removable with earth-moving equipment and did not take into account any rock cut. With other items, its total bid was $99,852.94. With the proposal, the company filed a surety company bond, the condition of which was that if the company's bid was accepted, the contract awarded to it, and it executed a contract for the work acceptable to the highway commissioner, the obligation would be void.

When the bids for the work were opened on December 23, 1940, that of the company was the lowest. When its bid was read, its representative heard someone say: "Don't this guy know there is rock on this job?" He then went to the office of the contract clerk and asked if there was rock, and the clerk, referring to a memorandum, said that there were about 40,000 cubic yards. Thereafter the company wrote the department stating that, owing to its failure to interpret correctly the earth structure when the site was visited and the standard specifications, it had included no rock in its bid, that it was unfamiliar with the Connecticut classifications of work, and that this was the first job on which it had bid which involved an unclassified excavation; and it requested permission to withdraw its bid. There followed conferences with highway department officials, at one of which the commissioner, the director of engineering and construction for the department and the president of the company were present. At this time the director went through the plans, pointing out the subbases and slopes as indicating the presence of rock, and, when asked whether the department had taken borings to determine the extent of the rock cut, he answered that it had, for its own use. He stated repeatedly that the cross-section drawings showed that the rock cut would be 38,000 cubic yards. The com-

pany was induced to execute the contract in reliance upon the statement of the director of engineering that the extent of the rock cut was shown on the cross-section drawings and that these showed that the cut would total about 38,000 cubic yards. In its conclusions, the trial court found that the company was induced to execute the contract by reason of the department's representations that the rock cut would total about 38,000 cubic yards.

Both the commissioner and the director of engineering knew that the company's bid had been made on the basis of material that could be handled by earthmoving equipment. The commissioner stated that he doubted whether anything could be done for the company but said that he would take the matter up with the attorney general. The company then employed a construction cost analyst to make an estimate as to the probable losses it would incur if it went ahead with the work and advise it whether it should sign the contract or refuse and incur the loss, which it believed it would incur, under the bond it had filed if it refused to sign. The analyst computed the amount of rock cut shown on the plans as 36,000 to 38,000 cubic yards and advised the company to proceed with the contract. On January 27, 1941, the company was notified of the acceptance of its bid and shortly after executed the contract. It did so in reliance upon the statement of the department representative that soundings had been made and the amount of rock excavation appeared on the plans; and if it had believed that more rock excavation than that so shown would be necessary it would not have entered into the agreement. A fair price for rock cut, requiring drilling and blasting, would have been $1.50 or more per cubic yard. When the company had completed about half of the required excavation but had not taken out all

the rock shown on the plans, it had removed 38,933 cubic yards of rock. It made numerous complaints to the department and requested a revision of the contract price, but nothing was done. As the work proceeded, rock was found in sections where none was indicated on the plans. The company finally stopped work on September 15, 1941, and wrote the department that it had rescinded the contract because of the misrepresentations as to the amount of rock to be excavated. The department, after notifying the company that it would do so, made a contract with another corporation for the completion of the job. That corporation, in the course of the work, excavated more than 30,502 cubic yards of rock, making the total amount of rock taken out 69,435 cubic yards.

In its finding of subordinate facts, the court states that the contract was rescinded within a reasonable time. The gist of its other conclusions is that, because of the mistake of the company in failing to take into account in making its bid that a large amount of rock excavation was necessary, it had the right to withdraw its bid; that it entered into the contract because of the department's representations that the rock to be excavated would amount to about 38,000 cubic yards when in fact 69,435 cubic yards of rock were taken out; and that the company was entitled to rescind the contract and recover the reasonable value of the work it had performed, stipulated by the parties to be $90,000, less the payments that had been made to it.

The proposal by the company submitted to the department was nothing more than an offer to enter into a contract for the work. In its request for bids the department expressly reserved the right to reject any or all that might be made. The bond which accompanied the company's proposal was conditioned upon

the acceptance of its bid.[2] The offer was not supported by any consideration and until it was accepted the company could withdraw it whether or not it was based upon a mistake. *Lloyd & Elliott, Inc.* v. *Parke,* 112 Conn. 504, 506, 152 A. 825; 1 Williston, Contracts (Rev. Ed.) § 55. The fact that the specifications contained a provision that a request for withdrawal must be made in writing before the opening of the bids would not limit the right of the company in this respect; before acceptance of the bid the requirement was no more binding upon the company than any other provision of the proposal. *Hargrove* v. *Crawford,* 159 Iowa 522, 523, 141 N. W. 423; *Toledo Computing Scale Co.* v. *Stephens,* 96 Ark. 606, 608, 132 S. W. 926; *Night Commander Lighting Co.* v. *Brown,* 213 Mich. 214, 216, 181 N. W. 979; Williston, loc. cit. The company did not, however, withdraw its bid, and on January 27, 1941, the department awarded the contract to it. Unless it be because of the circumstances hereinafter discussed, the company then became obligated to enter into a contract to perform the work, and thereafter it did not have the right, although it did have the power, to refuse to do so. *Blakeslee* v. *Board of Water Commissioners,* 106 Conn. 642, 653, 139 A. 106. The question is: Were there circumstances which so far invalidated its agreement that it was entitled later to rescind the contract?

The department, having made certain soundings for its own use, based its plans for the work upon the facts so discovered. It may be conceded, as the state claims, that those plans truly and fully represented the infor-

---

[2] The company suggests in its brief that even before acceptance of its proposal there would have been a liability on the bond. It cites *State of Connecticut* v. *F. H. McGraw & Co.,* 41 F. Sup. 369, 371, and *Franklin A. Snow Co.* v. *Commonwealth,* 303 Mass. 511, 516, 22 N. E. 2d 599, but in each case the bid had been accepted.

mation which it had; and it would be difficult to sustain the trial court's conclusion that it made any representations of a fraudulent nature as to the character of the material to be removed. In the situation before us, however, proof of fraudulent representations is not necessary to sustain a recovery by the company. It would be sufficient to support the company's right to rescind the contract that the department made material misrepresentations of fact upon which the company had a right to rely and which induced it to enter into the contract. *E. & F. Construction Co.* v. *Stamford,* 114 Conn. 250, 257, 158 A. 551. It does not appear, however, that there were any misrepresentations of any nature by the department upon which the company had a right to or did in fact rely in making its proposal. In it the company stated that it had examined the specifications. These required it carefully to examine the plans, contract form and site of the work, and clearly placed upon it the responsibility to determine for itself "the conditions to be encountered, as to the character, quality and quantities of the work to be performed"; and while the plans did show that there was rock to be removed, no representative of the company made such an examination of them that this fact entered in any way into the determination of the amount of its bid.

If the company has any right to recover, it must be based upon the representations made by the director of engineering at the conference at which he, the highway commissioner and the president of the company were present. The only direct finding as to such representations is that the director repeatedly stated that the cross-section drawings showed that the rock cut would be 38,000 cubic yards. Later, in reciting the causes which induced the company to enter into the contract, the court found among them that the director

stated in addition that the drawings showed the extent
of the rock cut, that is, all the rock which would have
to be removed in doing the work. Finally in its conclu-
sions, the court states that the company was induced to
execute the contract by the department's representa-
tions that the rock cut would total about 38,000 cubic
yards, whereas in fact it totaled 69,435 cubic yards. It
thus appears that there is a vital difference between the
trial court's direct finding as to what took place at the
conference and its later recitals in the finding and con-
clusions as to the causes which induced the company to
enter into the contract. The former went no further
than a representation that the cross-section drawings
showed the amount of excavation required to be 38,000
cubic yards. That was substantially true, and it would
not support a claim of the company to recover upon
the basis of misrepresentation. On the other hand, the
recital later in the finding and in the conclusion as to
the causes inducing the company to enter into the con-
tract, that the drawings showed the extent of the rock
cut, which would be 38,000 cubic yards, might be found
to constitute such a representation. We would expect
that the trial court's direct recital as to what took place
at the conference would state all the representations
then made and that the finding and conclusion as to
the causes inducing the making of the contract would
naturally correspond to that statement. If we turn to
the memorandum of decision, to which we may refer
to ascertain the basis of the court's conclusions, we do
not find any statement of a representation by the de-
partment that the cross-section drawings showed the
amount of the rock which would have to be excavated,
but at most of an intention on its part that the com-
pany should rely upon them, an intention which the
memorandum does not state to have been expressed at
the conference. The judgment awarded the company

more than $86,000 damages. In the face of the lack of certainty in the finding as to the representations made by the department at the conference and the apparent conflict between the various recitals, we cannot feel that in justice to the parties we can sustain the decision upon the ground of a representation that only 38,000 cubic yards of rock would need to be moved.

This conclusion requires that the case be remanded for a new trial. We discuss, however, certain other claims made and fully argued before us which are likely to be involved in that trial.

If it should be found that the department did represent to the company that it would be necessary to excavate only 38,000 cubic yards of rock when the amount was in fact more than 69,000, and that the defendant was induced to enter into the contract by that representation, the court might be justified in concluding that the company, acting within a reasonable time, had a right to rescind the contract. While it is found that the company finally signed the contract only after it had consulted its own analyst and had been advised by him to do so, his advice was based upon the amount of rock to be excavated as shown in the drawings; and the trial court might properly conclude that the motivating cause of the action of the company in entering into the contract was the misrepresentations made by officials of the department. There could be no question of the materiality of a representation that there were only about 38,000 cubic yards of rock to be excavated, particularly in view of the situation with which the company found itself confronted before its bid was accepted, which was known to the department, and the finding that the fair price for rock removal was $1.50 a cubic yard or more. The cases of *Weston* v. *State*, 262 N. Y. 46, 186 N. E. 197; *Scherrer* v. *State Highway Commission*, 148 Kan. 357,

80 P. 2d 1105; and *O'Neill Construction Co. v. Philadelphia,* 335 Pa. 359, 6 A. 2d 525, upon which the state relies, differ radically from the one before us in that there were in them no such specific representations as to the amount of rock to be removed as the court in this case made the basis of its decision. See also *Maryland Casualty Co. v. Board of Water Commissioners,* 66 F. 2d 730, 733.

That the contract was made on the basis of a unit price for "unclassified excavation" could in no way deprive the company of the right to avoid it for misrepresentations which induced its execution. The provision in the twenty-fourth amendment to the constitution that neither the General Assembly nor a municipality may increase the pay of any public contractor above the amount specified in the contract is not involved in the issues before us; the sum which the judgment calls upon the state to pay is not a voluntary increase of a contractual obligation but damages resulting from the misrepresentations of its officers. The trial court did not err in so far as it held that the company would be entitled to interest on the amount the court found due. Upon the conclusions it reached, when the company rescinded the contract and ceased work it became entitled to damages, including an allowance of interest for the withholding of the money it was entitled to receive. *Hoyt v. Pomeroy,* 87 Conn. 41, 49, 86 A. 755; *Southern New England Ice Co. v. West Hartford,* 114 Conn. 496, 512, 159 A. 470; *Campbell v. Rockefeller,* 134 Conn. 585, 591, 59 A. 2d 524. The parties by stipulation agreed upon the reasonable value of the work done by the company, and that it sought in its counterclaim to recover a greater amount than that finally agreed upon does not preclude an award of interest on the sum the trial court, in accord-

ance with the stipulation, found to be due. *Loomis* v. *Gillett*, 75 Conn. 298, 300, 53 A. 581.

The action taken by the parties in stipulating as to the amount of damages should the plaintiff prevail is most commendable, as it undoubtedly saved much time in the trial of the case which would have otherwise been necessary. It would seem that, in view of our decision, many other facts could be agreed upon as the basis for the new trial which we order.

There is error, the judgment is set aside and a new trial is ordered.

In this opinion the other judges concurred.