STATE OF CONNECTICUT *v.* THE HARTFORD ACCIDENT AND INDEMNITY COMPANY ET AL.

BROWN, C. J., JENNINGS, BALDWIN, INGLIS and O'SULLIVAN, Js.

Argued October 3—decided November 13, 1951

*Thomas J. Conroy,* assistant attorney general, with whom were *William L. Beers,* deputy attorney general,

and, on the brief, *George C. Conway,* attorney general, for the appellant (plaintiff).

*Ernest W. McCormick,* with whom were *Frank Chapman* and *William W. Graulty,* for the appellees (defendants).

O'SULLIVAN, J. The plaintiff brought this action against the defendant Deliso Construction Company to recover damages for the alleged breach of a highway construction contract. The Hartford Accident and Indemnity Company, which had given its bond conditioned upon the faithful performance of the contract, was joined as party defendant. The Deliso Company, hereinafter called the company, filed a counterclaim to recover the reasonable value of the work it had done up to the time when it rescinded the contract, less the payments it had received, because of an alleged misrepresentation by officials of the state highway department. The court rendered judgment for both defendants on the complaint and for the company on its counterclaim. The plaintiff's appeal is addressed only to that phase of the judgment which disposed of the counterclaim.

The court found, among others, the same facts as those which are recited at length in the opinion on a former appeal. *State v. Hartford Accident & Indemnity Co.,* 136 Conn. 157, 160, 70 A. 2d 109. They need not be repeated except in the following abbreviated form: The company, with others, submitted to the state highway department a bid on a proposed road construction job. The bidders had been supplied with plans and specifications, together with a list of items of work to be performed. Included in the latter was an item, "Unclassified Excavation - - - C. Y. - - - 125, 983." The department's standard specifications classi-

fied excavation as "Earth," "Rock," "Loam" or "Unclassified"; they defined "Unclassified" as "any and all materials, other than water." The department had previously made borings to determine the character of the materials to be excavated, but the data derived from these operations, showing that the rock cut would run to 38,772 cubic yards, were not directly noted on the drawings for the information of the bidders. By a resort to certain assumptions, however, a bidder could interpret the cross-section drawings attached to the plans as indicative of the presence of 38,000 cubic yards of rock cut. In spite of this, the company mistakenly assumed that no solid rock was involved and that the excavation could be handled with earth-moving equipment. It accordingly prepared its bid on the basis of 29 cents per cubic yard. A fair price for rock cut would have been a minimum of $1.50 per cubic yard. On the day when the bids were opened, it was found that the company was the lowest bidder. The company then learned for the first time that the work involved rock excavation and it sought permission to withdraw its bid. At a subsequent conference between the highway commissioner and his director of engineering and construction on the one hand and a representative of the company on the other, the director repeatedly stated that the cross-section drawings showed the amount of rock which would have to be cut and that it totaled 38,000 cubic yards. In reliance on these statements, the company, although foreseeing an operating loss if it undertook the job, joined in the execution of a formal contract.

Within a few months after the company commenced work, it had excavated almost 39,000 cubic yards of rock. It was apparent by that time that many more thousand cubic yards remained. After attempting without success to obtain from the highway depart-

ment a revision of the contract price, the company ceased its operations and rescinded the contract. This was done within a reasonable time after it became obvious that the department's officials had misstated the extent of the rock cut. It later developed that the total rock cut approximated 70,000 cubic yards. The judgment from which the plaintiff has appealed awarded to the company the reasonable value of the work performed before the contract was rescinded, less the payments it had received.

It was pointed out in the opinion on the former appeal that the award of damages to the company at the first trial could not be supported because of certain discrepancies in the finding. *State* v. *Hartford Accident & Indemnity Co.,* supra, 167 et seq. It was there stated that "If the company has any right to recover, it must be based upon the representations made by the director of engineering at the conference at which he, the highway commissioner and the president of the company were present." Id., 167. We further said that "If it should be found that the department did represent to the company that it would be necessary to excavate only 38,000 cubic yards of rock when the amount was in fact more than 69,000, and that the defendant was induced to enter into the contract by that representation, the court might be justified in concluding that the company, acting within a reasonable time, had a right to rescind the contract." Id., 169.

The conflict and uncertainty referred to in the former opinion are resolved by the finding on the present appeal. The court has specifically found that at the conference in question the director of engineering repeatedly stated to the company's agent not only that the cross-section drawings showed the amount of rock to be excavated but also that it amounted to 38,000 cubic yards. It was in reliance on these representa-

tions that the company was induced to execute the contract.

The plaintiff now contends that the statements of the director of engineering were not binding upon it since, it is claimed, they were not within the scope of his authority to make. The contention is that the statements were made after the bids were opened and that they changed the terms of the original bid proposal, contrary to the provisions of General Statutes, Cum. Sup. 1935, § 529c (Rev. 1949, § 2229).[1] It is, of course, true that public officers must act within their statutory duties and that those who deal with them are bound at their peril to take notice of the scope and measure of the authority of such officers. *Silliman & Godfrey Co.* v. *Westport,* 111 Conn. 510, 515, 150 A. 502; *Lucier* v. *Norfolk,* 99 Conn. 686, 695, 122 A. 711; *Thomas Motor Car Co.* v. *Seymour,* 92 Conn. 412, 414, 103 A. 122. They have no implied powers except those that are necessary to carry into effect the powers expressly conferred on them. *Bridgeport Brass Co.* v. *Drew,* 102 Conn. 206, 214, 128 A. 413; 43 Am. Jur. 69, § 250.

These principles, however, have no pertinent application since the statements of the director of engineering at the conference did not involve a revision of the plans and specifications. The statements merely confirmed what the cross-section drawings disclosed. They neither diminished nor enlarged the extent of the work upon which proposals to bid had been invited, nor did they modify its character. They concerned information to which any bidder, uncertain as to the intended meaning of the plans and specifications, was in fairness entitled. Section 529c provides not only for the

---

[1] Section 529c authorizes the highway commissioner to seek bids for construction work and outlines the procedure to be followed. This was the statute in force when the contract was executed in 1941.

submission of bids to and the award of the contract by the highway commissioner but also for the execution of the contract by him. Incident to executing the contract, it was a part of his duty to procure the signature of the successful bidder to the contract. At the time of the conference of the commissioner, the director of engineering and the company — a time prior to the acceptance of the bid — the company could choose either to sign and go forward with the work or to refuse to do so. The purpose of the director in making the representation as to the amount of rock cut disclosed on the cross-section drawings was to induce the company to choose the former alternative and thereby procure the execution of the contract. It was, therefore, a representation clearly made within the scope of his authority. There is nothing in the history of the language of § 529c, or in the purpose it was designed to serve, or in the circumstances surrounding its enactment, which indicates that it was intended to prohibit the highway commissioner or his deputies from answering inquiries made by a bidder, either before or after the opening of bids, in order that he might be better informed of the nature and extent of the work called for by the plans and specifications.

The positive assertion that the drawings showed the amount of rock which would have to be cut and that it totaled 38,000 cubic yards was a representation upon which the company had a right to and did rely. *United States* v. *Atlantic Dredging Co.,* 253 U. S. 1, 11, 40 S. Ct. 423, 64 L. Ed. 735; *Christie* v. *United States,* 237 U. S. 234, 242, 35 S. Ct. 565, 59 L. Ed. 933; *Hollerbach* v. *United States,* 233 U. S. 165, 172, 34 S. Ct. 553, 58 L. Ed. 898. This is not an action for deceit, which requires proof of the knowledge of the falsity of the representation. *Henry* v. *Kopf,* 104 Conn. 73, 75, 131 A. 412. The company was under no obligation to

allege and establish that the misrepresentation was intentionally made. *Tompkins, Inc.* v. *Bridgeport,* 100 Conn. 147, 154, 123 A. 135. It was ample if the misrepresentation went to the root of the contract and induced the company to execute the contract. Under these circumstances, the company had a right to rescind within a reasonable time and to recover damages based on the rescission. *E. & F. Construction Co.* v. *Stamford,* 114 Conn. 250, 258, 158 A. 551.

There is no error.

In this opinion the other judges concurred.

