## CHRISTIE v. UNITED STATES.

### APPEAL FROM THE COURT OF CLAIMS.

No. 204. Argued March 16, 17, 1915.—Decided April 12, 1915.

Where there is a deceptive representation in the specifications as to the material to be excavated which actually misleads the bidder who obtains the contract, and it is admitted by the Government that time did not permit borings to be made by the contractor to verify the representations, the latter is entitled to an allowance for the actual amount expended over what would have been the cost had the boring sheets been accurate, notwithstanding there *was* no sinister purpose whatever.

The legal aspects of such a case are not affected by the fact that the

omissions amounting to misrepresentations did not have a sinister purpose.

Under the contract involved in this case, all that is cast upon the Government in establishing the "angle of repose" for the slopes of the banks on each side of the excavation is an honest exercise of judgment by the engineers, and the contractors are not entitled to damages by reason of the sloughing of the banks on account of too sharp an angle.

In this case the findings do not support claimants' contention that the "angle of repose" was arbitrarily selected and adhered to.

The contractor, in this case, *held* not entitled under the terms of the contract to recover the cost of recovering buried concrete forms which according to the findings was done voluntarily so as to re-use the forms.

The Government is not responsible to the contractor for a promise of additional compensation for cofferdams to protect the work made by an officer not having authority and whose promise is subsequently revoked before the work of construction commences.

In this case *held* that the paragraph in a Government contract providing for extra work did not supersede the paragraph requiring work to be done by the contractor himself; and that as the conditions contemplated by the contract required the use of cofferdams to protect the work to the height ordered by the engineers, the contractor was not entitled to extra compensation therefor.

48 Ct. Cl. 293, reversed on account of error as to one item claimed and disallowed.

THE facts, which involve the rights of a contractor for compensation for work done under a contract with the United States for the construction of locks and dams on the Warrior River, are stated in the opinion.

*Mr. George A. King* and *Mr. Frank Boughton Fox,* with whom *Mr. Duane E. Fox* was on the brief, for appellants:

There were erroneous and deceptive borings. *Hollerbach* v. *United States,* 233 U. S. 165; *Pearson* v. *Dublin Corporation,* 1907, App. Cas. 351; *Boyd & Forrest* v. *Glasgow Ry.,* 1914, 1 Scots Law Times Rep. 176; *Hingston* v. *Smith Company,* 114 Fed. Rep. 294; *Simpson* v. *United States,* 192 U. S. 272. There were misrepresentations by

agents of United States which were rightly relied upon. The claim was made at the proper time and appellant is entitled to damages.

The banks were not sloped to angles of repose. The slope was not an angle of repose. The reasons for not sloping are insufficient. There was a protest and demand for compensation.

The order for additional cofferdams was a valid order for extra work.

In support of these contentions see cases *supra* and Abbot, Problems of the Panama Canal; *Bayne* v. *United States*, 195 Fed. Rep. 236; *Beckwith* v. *New York*, 148 N. Y. App. Div. 658; *Bowen & Dudy Co.* v. *United States*, 211 U. S. 176; *Callahan Constr. Co.* v. *United States*, 47 C. Cls. 177; *Central Trust Co.* v. *Louisville Ry. Co.*, 70 Fed. Rep. 282; *Chatham Furnace Co.* v. *Moffatt*, 147 Massachusetts, 404; *Cooper* v. *Schlesinger*, 111 U. S. 148; *Cramp & Sons Co.* v. *United States*, 216 U. S. 494; *Delafield* v. *Westfield*, 28 N. Y. Sup. 440; *S. C.*, 169 N. Y. 582; *Eaton* v. *Winnie*, 20 Michigan, 156; Floyd, Acceptances, 7 Wall. 666; *Fontano* v. *Robbins*, 22 App. D. C. 253; *Gleeson* v. *Va. Midland R. R.*, 140 U. S. 435; Isthmian Canal Commission Report, 1913; *Johnson* v. *Albany*, 86 N. Y. App. Div. 567; *Langley* v. *Rouss*, 77 N. E. Rep. 1168; *S. C.*, 185 N. Y. 201; *Mercantile Trust Co.* v. *Hensey*, 205 U. S. 298; *Nesbit* v. *L. C. & C. R. R.*, 2 Speers, 697; *Old Colony Trust Co.* v. *Dubuque Co.*, 89 Fed. Rep. 794; *Peterson* v. *New York*, 205 N. Y. 329; *Pickley* v. *United States*, 46 C. Cls. 77; *Railway Co.* v. *Donnegan*, 111 Indiana, 179; *Reynell* v. *Sprye*, 1 DeG., M. & G. 660; *Richards* v. *May*, 10 Queen's Bench Div. 400; *Ripley* v. *United States*, 223 U. S. 695; *Samley District* v. *Ricker*, 91 Fed. Rep. 833; *Sharp* v. *New York*, 40 Barbour, 256; *Smith* v. *Richards*, 13 Peters, 26; *Stage Co.* v. *United States*, 39 C. Cls. 420; Thomas & Watt, Improvement of Rivers, 2d ed. (1913), pt. 1, pp. 86, 199; *United States* v. *Garbish*, 222 U. S. 257; *United States*

v. *Plumley,* 226 U. S. 545; *United States* v. *Stage Company,* 199 U. S. 414; *Water Commissioners* v. *Robbins,* 74 Atl. Rep. 938.

*Mr. Assistant Attorney General Thompson* for the United States:

As to the erroneous and deceptive borings:'

Appellants had actual and presumptive knowledge of the conditions, which was sufficient notice without indicating further on the drawings, and excluded charges of erroneous and deceptive representations of borings.

The findings contradict the statement in appellants' brief that a number of buried logs were discovered in the course of the borings.

The terms of the contract and the findings exclude the idea of a warranty. *Hollerbach* v. *The United States,* 233 U. S. 165, and other cases distinguished.

As to erroneous angles of repose:

The engineer officer being authorized to select the angle of repose, in the absence of a finding charging bad faith, his selection cannot be disputed.

No angle of repose would have remained stable during the abnormal season of 1900–1901.

The angle of repose selected being the customary one under ordinary conditions, and not having been objected to, appellants are foreclosed from asking damages.

Appellants have been paid the contract price for all excavation removed.

The claim for damages for excavating material which buried certain timber frames falls with the claim for damages because of an alleged incorrect angle of repose.

As to the construction of cofferdams:

The Government was not responsible for the cost of cofferdams since it was provided that the contractors should build them at their own expense.

In support of these contentions see *Bowe* v. *United*

*States*, 42 Fed. Rep. 778; *Bowers Dredging Co.* v. *United States*, 211 U. S. 176; *Boyd* v. *Glasgow Western Ry. Co.*, 1 Scots Law Times Rep., 1914, p. 171; *Clapham* v. *Shillito*, 7 Bevan's Rep. 149; *Farrar* v. *Churchill*, 135 U. S. 615; *Gleason* v. *United States*, 175 U. S. 602; *Hollerbach* v. *United States*, 233 U. S. 165; *Kihlberg* v. *United States*, 97 U. S. 398; *Nesbit* v. *L. C. & C. R. R. Co.*, 2 Speers, 697; *Pearson* v. *Dublin Corporation*, 1907, App. Cas. 351; *Plumley* v. *United States*, 226 U. S. 545; *Ripley* v. *United States*, 223 U. S. 695; *Chicago* v. *Ricker*, 91 Fed. Rep. 833; *Shapirio* v. *Goldberg*, 192 U. S. 232; *Simpson* v. *United States*, 172 U. S. 372; *Slaughter's Admr.* v. *Gerson*, 13 Wall. 379; *United States* v. *Barlow*, 184 U. S. 123.

Mr. Justice McKenna delivered the opinion of the court.

Action for damages in the sum of $207,304.50 brought by appellants against the United States, growing out of a contract with the United States on the nineteenth of February, 1900, for the construction of three locks and dams on the Warrior river in Alabama.

The work was completed and accepted in November, 1903.

The items of damage were: delay in permitting commencement of the work; for construction of wagon roads; greater expense of excavation and pile driving due to misrepresentation of the materials in the specifications and drawings; increase in excavation due to the "angle of repose" fixed by the officer in charge; extra work in the construction of additional cofferdams, and other items.

. The court rendered judgment for claimants upon two items, based on findings 2 and 3, to-wit, $9,391.57 for "delays in permitting the commencement of work" and $100.00 for "construction of wagon roads," making a total of $9,491.57.

This appeal was then prosecuted, and three errors are assigned—(1) in refusing to allow for the extra expense due to the increased difficulty in pile driving and excavation on account of misrepresentation of the materials to be penetrated and excavated; (2) in refusing to allow $45,000.00 for excavation of material caused by defect in the "angle of repose," and in refusing to allow the further sum of $1,183.00 for excavation of material under which certain concrete forms were buried; and (3) in refusing to allow the cost of cofferdams built on the order of the officer in charge.

We shall take these items up in their order.

(1) This item is based on a charge of erroneous and deceptive borings and misrepresentations in the specifications and drawings.

By paragraph 48 of the specifications it is, among other things, provided: "The material to be excavated, *as far as known* [italics ours], is shown by borings, drawings of which may be seen at this office, but bidders must inform and satisfy themselves as to the nature of the material."

It is upon this paragraph the contention turns.

The allegations of the petition of claimants are to the effect that, invited by the above provision, claimants examined the drawings and they "showed gravel, sand and clay of various descriptions, and showed no other material."

That the material actually to be excavated "consisted largely of stumps below the surface of the earth, buried logs, of cemented sand and gravel (none of the sand or gravel being described in the said drawings as cemented), and of sandstone conglomerate," and that such materials were far more difficult and expensive to penetrate and excavate than ordinary sand and gravel such as was described in the drawings.

That the existence of the more difficult and expensive

material was known to the persons who made the borings and to the resident engineer of the United States under whose supervision they were made; and that the statement in the specifications was untrue in fact and misleading, causing the claimants to propose to do the work upon the basis shown by the drawings and not upon the basis of the more difficult and expensive work, which in point of fact existed and was known to the officers of the United States. That claimants were forced to rely wholly upon the information furnished them, the time not being sufficient to permit them to make their own borings, and they believed the information furnished them to be accurate and reliable. That the erroneous and deceptive drawings misled claimants and they were compelled to spend $10,510.30 over and above the rates named in their proposal and contract, which rates were based upon the materials shown by such drawings.

We think the findings substantially sustain the allegations. They establish that borings were made and that the drill met "obstructions which from the particles broken off and floating to the surface would indicate they might be logs." These obstructions, though in some instances noted because of the formation, were not indicated on the drawings.

And this was found: "When such obstructions were met, the apparatus was moved elsewhere until a place was found where the drill would penetrate, and the result was recorded as if taken at the place staked out." And, further: "The boring sheets referred to in paragraph 48 of the specifications contained only the record of completed borings and do not show any record of sunken logs, or of cemented sand and gravel, or conglomerate impenetrable by the drill."

The indications of buried logs were called to the attention of the resident engineer and he was asked if they should be noted in the record of borings, to which he replied

that he did not consider them of enough importance to be noted. It was, however, found that the evidence did not establish to the satisfaction of the court that the statement of the engineer was other than an honest expression of his opinion, nor was it made to induce the omission from the records of the borings of any logs actually encountered, or for the purpose of concealing the same from or misleading subsequent bidders.

It would seem as if there could be only one conclusion from these findings. There was a deceptive representation of the material, and it misled. In opposition to the seemingly irresistible conclusion that claimants were justified in their reliance upon the drawings, it is contended that the river was alluvial and its character warned claimants of the possible conditions which existed and that besides the court found "they admitted they had reason to, and did expect to, encounter some logs."

The contentions are attempted to be supported by the alluvial character of the river, as we have said, its tortuosity, its fluctuations between high and low water in winter and summer, and that for twenty years the United States had operated snag boats for the removal of stumps and sunken logs from the channel of the river. But inferences from such facts could only be general and indefinite, and were not considered by the Government as superseding the necessity of special investigations and special report. It assumed both were necessary for its own purpose and subsequently would be to those whom it invited to deal with it. Knowledge of the result of such investigations would protect the Government, it might be, against an extravagant price based on conjecture of conditions, and enable contractors confidently to bid upon ascertained and assured data. And how important it was to know the conditions is established by the finding that claimants were put to an expense of $6,150.00 over what would have been necessary "if the borings sheets

had represented the character of the ground with respect to logs."

It makes no difference to the legal aspects of the case that the omissions from the records of the results of the borings did not have sinister purpose. There were representations made which were relied upon by claimants, and properly relied upon by them, as they were positive. *Hollerbach* v. *United States*, 233 U. S. 165. Besides it was admitted at the argument that time did not permit borings to be made by claimants. We think it was error, therefore, to have disallowed the damage resulting therefrom.

(2) The "angle of repose" is dealt with in the specifications as follows: "The limits of the excavation and quantities to be excavated will depend upon the ascertained angles of repose. The limits shown on the drawings and the amounts herein given are approximate, and may be greater or less as the local conditions may demand or justify."

The finding as to the "angles of repose" is that at the outset of the work, under direction of the engineer officer, "the slopes of all temporary excavation at the lock sites were staked out on an angle of 1 on 1, or 45° from horizontal." This angle, it was further found, was adopted by the engineer officer from his experience in similar work on the Mississippi river and was "an angle at which the banks would stand for the time necessary to complete the work when not submerged from rises in the river or when in a dry condition. There was no angle or slope which could have been adopted by which the banks would remain stable when subjected to such rises of the river as were liable to happen in times of flood." And, further, that the conditions actually encountered during the work were abnormal; floods, freshets and unlooked for rises of the river were more numerous and of greater height and longer duration than theretofore disclosed by the official records of the engineer's office relating to the river.

Other findings are as follows:

"To have sloped the banks to a flatter angle would have reduced the sloughing, but the evidence does not show to what extent. When the river rose the material in the banks became saturated and heavy with water, and as the river receded such material, being deprived of the support afforded by the water while up, sloughed or caved off into the lock pits below, where it had to be and was removed by claimants in a wet and slimy condition at a higher cost than if excavated from its natural position in the bank. The slopes of the excavation were not flattened by the engineer officers because, in their opinion, there was no practical angle at which the banks could have been sloped which would have caused them to remain stable under the abnormal conditions to which they were subjected, or have prevented the banks from sloughing and caving as the floods and rises in the river receded."

Claimants present a definition of an "angle of repose" from lexicons of authority as follows: "The maximum angle with the horizontal at which a mass of material, as in a cut or embankment, will lie without sliding." In addition to the definition reports of work on the Panama Canal are quoted from to show the efficacy of the proper angle and the necessity of varying it to meet conditions. This and the correctness of the definition may be conceded, but the question is, What were the demands of claimants' contract in the situation described by the findings? Or, to make it more special: Was the act of the engineering officer in prescribing the slope of the work as 1 on 1 or 45° from horizontal a violation of the contract?

As we have seen, the findings show that such angle had been selected from experience in other work of like kind, that it would have been adequate but for the extraordinary conditions which developed, and no angle under such conditions would have been sufficient and, therefore, "the

slopes of the exc? ration were not flattened by the engineer officers because in their opinion, there was no practical angle at which the banks could have been sloped which would have caused them to remain stable under the abnormal conditions to which they were subjected, or have prevented the banks from sloughing and caving as the floods and rises in the river receded." And this judgment was honestly exercised.

We are brought, therefore, to the question whether such judgment was precluded by the contract, or did the contract impose an absolute duty on the Government to anticipate and provide for all conditions to which the banks of the excavation might be subjected?

Claimants insist upon an affirmative answer and rely upon paragraph 48 of the specifications, which provides that "all dredged or excavated materials, of whatever nature, will be classified as 'excavation.' All excavations shall conform to such lines, slopes, and grades as may be given by the engineer officer and anything taken out beyond such given limits will not be paid for by the United States. The price for excavation shall include the removal of the material to its place of deposit. . . . The limits of the excavation and quantities to be excavated will depend upon the ascertained angles of repose." There is nothing in this of definite obligation, or which prevented an exercise of judgment. The excavations, it is true, were required to conform to the lines, slopes and grades and their limits and quantities made to depend upon the ascertained angles of repose; but how the angles of repose were to be ascertained was not expressed. According to the findings they would depend upon the conditions, and as to these judgment had to be exercised, and the specifications pointed out by whom. "These specifications," it is provided in paragraph 89, "are intended to be full, clear and complete. Any doubt as to their meaning, or any obscurity in the wording of them, will be explained by the

Engineer Officer, who shall also have the right to correct any errors or omissions in them whenever such errors or omissions become apparent." Paragraph 78 declares: "In all cases of dispute, the decision of the United States Engineer Officer in charge will be accepted as final and without appeal."

Claimants were, therefore, admonished that the judgment of the officers would necessarily be exercised throughout the work and they were specially informed as to what angle of repose would be selected. Mr Justice Howry, speaking for the Court of Claims, said: "The letting plans did not show the slopes of the excavation. But the original cross-section sheets, from which the estimated quantities of excavation in the specifications had been calculated, show in pencil the different angles of all slopes at 1 on 1 behind structures for temporary work and a flatter slope of 1 on 1½ to 1 on 2 during the period of the contract for all permanent work. Both angles of repose were constructed accordingly. These cross-section sheets, although not made part of the letting plans, were on file in the office of the resident engineer and were open to examination by bidders prior to submitting proposals and were, in fact, examined by at least one of the prospective bidders. There was no concealment and plaintiffs do not say there was."

We do not think, therefore, that there is anything in the contract which cast upon the Government a prophecy and anticipation of abnormal conditions or which relieved claimants from the risks of their occurrence or of whatever they might encounter in the work. It is to be supposed that contemplation and judgment were exercised not only of certainties but of contingencies and allowance made for both at the time of bidding, with provision in the bid. Subsequent conditions could not lessen the obligation then incurred but, we may say, in order that all of the facts bearing on the claimants' contention may appear,

that the findings show that claimants, in July, 1900, prior to the time when any sloughing had occurred, in a letter to the resident engineer, suggested the use of sheathing to protect the slopes, and in 1902 complained that the Government had not complied with the suggestion as provided for in paragraph 51 of the specifications. But it is further found that the suggestion was not yielded to because, in the opinion of the engineer officer, paragraph 51 was not intended to provide for protecting the slopes.

The paragraph reads as follows:

"51. Sheathing.—Curbing of rough planks and scantlings or poles, shall be used to reduce excavation as directed by the Engineer Officer, and shall be paid for as 'sheating,' poles being estimated by standard log measure. It shall be left in the excavation or taken out at the option of the Engineer Officer, and when used again shall be paid for at half price."

It is further found that claimants made verbal protests and complained to the resident engineer in regard to the adoption of flatter slopes but no written protest or objection was made during the progress of the work and no appeal from the decision of the engineer concerning the same. Such an appeal seems to be provided for. It is to be observed that the protest was made to the resident engineer, but he was subordinate to the Engineer Officer in charge, and it is provided in paragraph 78 that "in all cases of dispute the decision" of that officer "will be accepted as final without appeal."

These findings, therefore, but exhibit the variant judgments of the resident engineer and the claimants as to what action should be adopted in view of the conditions, and, we repeat, we see nothing to cast inevitable obligation upon the Government for every exercise of judgment by its officer to whom was given the direction of its works and whose decision, honestly exercised, its contracts made final.

It is true, it is said that the "angle of repose" was arbitrarily selected and arbitrarily adhered to, but the findings, as we have seen, do not support the charge.

It follows that the court committed no error in rejecting the item. Nor, for the same reason, in refusing to allow the sum of $1,183.41, the cost of recovering certain buried concrete forms. It is found that this "was done voluntarily by claimants for the purpose of recovering the forms to be re-used by them."

(3) The amount claimed for additional cofferdams is $8,520.24.

It is said by the court in its opinion that claimants did not claim that this part of their demands was within the contract, but that they were "entitled to recover therefor on *quantum meruit.*" The item was disallowed. This action, we have seen, is assigned as error, and to support the assignment paragraphs 45 and 88 of the specifications are invoked. They are, respectively, as follows:

"45. *Cofferdams.*—All pumping, bailing, and temporary works needed to protect the permanent work from water, during the construction, shall be done by the contractor at his own expense, the cost of same to be included in his prices for concrete, timber, etc. It is probable that the sheet piling entering into permanent construction can, with proper banking and shoring, be made to serve the purpose of cofferdams, but the contractor must rely upon his own judgment in regard to this. Should additional cofferdams be needed they shall be built on plans approved by the Engineer Officer, and, where liable to interfere directly or indirectly with navigation, shall be removed when no longer needed, the building, maintaining, and removal of same to be without cost to the United States."

"88. *Purchases Made or Work Done, Not Specified.*— If at any time it should become necessary, in the opinion of the Engineer Officer in charge, to do any work or to make any purchases not herein specified, for the proper

completion of this contract, the contractor will be required
to furnish the same at the current rates existing at the
time of said purchases or work. The current rates to be
determined by the Engineer Officer in charge."

The findings state that certain hydrographs showing the
gauge readings of the river taken at Tuscaloosa were shown
claimants and that the slope of the river indicated the
duration of the winter and spring floods and the effect
of such floods upon the continuity of the work; that floods
pass off rapidly at Tuscaloosa but their duration is several
days longer at the locations of locks 4, 5 and 6. The
hydrographs did not show the readings at those places,
nor were claimants informed of them, though the resident
engineer knew of them as they had been copied in a mem-
orandum kept in his office at Tuscaloosa. In the court
below a charge of fraudulent representation was based
on those facts, but the court found adversely to it, and
it is not repeated here. We shall pass, therefore, to con-
tentions based on other considerations.

The facts found by the court may be stated narratively
as follows: In order that the work might be continued
during the winter the resident engineer, on November 17,
1900, directed claimants to build cofferdams at locks 4, 5
and 6 in accordance with plans furnished them, and in-
formed claimants that they would be paid for the same
at their contract price for sheet piles, and $3.00 per thou-
sand feet board measure for such parts of the cofferdams as
they might be required to remove when no longer needed.
The order was accepted by claimants in writing on No-
vember 18, 1900, and the materials ordered for the same.
Three days after the receipt of the order and before the
construction of the dams had been commenced the river
rose and remained at such height that it was not possible
to build them that winter. It is found that doubts sub-
sequently came to the officer as to his authority to pay for
the cofferdams, as the emergency for which they were

intended to provide had passed—that is, their construction during the winter—and he expressed those doubts in a letter to claimants dated May 4, 1901. Claimants protested, and the matter was referred to the Chief of Engineers, who referred it to the Secretary of War, and the latter officer submitted it to the Judge-Advocate General of the Army for opinion. That officer decided that the Secretary of War had no authority to modify the contract. This view was approved by the Secretary and claimants were notified accordingly.

It will be observed that by paragraph 45 cofferdams are represented as temporary work to protect the permanent work, and the probability is expressed that the sheet piling entering into the permanent construction could serve the purpose of cofferdams, but as to this the claimants were to rely upon their own judgment. And it is also to be observed that if additional cofferdams should be needed they were to be built on plans approved by the engineer officer and to be built, maintained and removed without cost to the United States.

By paragraph 46 the probability is again expressed that the dams could be built without cofferdaming, but as to this the claimants were to rely on their own judgment, and if cofferdams proved to be necessary they were to be furnished by claimants without cost to the United States.

It seems very clear, therefore, that all cofferdams necessary for the protection of the permanent work were to be built by claimants at their own expense, and it is found that, in figuring on their bid, they allowed $2000 for cofferdams for each of the three locks, or, in all, $6000.

It is further found that "the cofferdams were afterwards constructed by the claimants to the heights necessary to protect the work against floods," and that their cost was $11,456.91, "of which amount the portion necessary to protect the work against a rise of more than 8 feet was $8,520.24. . . . And if claimants are entitled to

recover therefor on *quantum meruit* or otherwise," that amount would be due.

Claimants, however, contend that they are entitled to this cost as extra work and invoke paragraph 88 against paragraphs 45 and 46. The paragraphs accord, or, rather, each has its purpose. The extra work provided for in paragraph 88 was not intended to supersede the work provided for and contracted to be performed by claimants at their expense by paragraphs 45 and 46. Nor can we yield to the contention that claimants had a discretion to use or not use cofferdams which was taken away from them by the order of the engineer officer and to comply with which they incurred expense that they otherwise would have not incurred.

The findings demonstrate that the flood conditions made cofferdams necessary, and to the height that they were constructed. The promise of payment made by the engineer officer was subsequently revoked before construction was commenced, and its revocation left the original contract to prevail. The Court of Claims, therefore, did not commit error by disallowing the demand.

For the error in not allowing the demand of the greater expense of excavation and pile driving, due to the misrepresentation of materials in the specifications and drawings, the judgment is reversed and case remanded for further proceedings in accordance with this opinion.

MR. JUSTICE MCREYNOLDS took no part in the consideration and decision of this case.