DRAVO CORPORATION, Appellant,

v.

COMMONWEALTH of Kentucky, DEPARTMENT OF HIGHWAYS and Charles Pryor, Jr., Kentucky Commissioner of Highways, Appellees.

Court of Appeals of Kentucky.

Nov. 25, 1977.

Discretionary Review Denied
April 25, 1978.

James G. Apple, Stites, McElwain & Fowler, Louisville, for appellant.

Dandridge F. Walton, Robert C. Fields, Dept. of Transportation, Frankfort, for appellees.

Before HOWERTON, GANT and WHITE, JJ.

HOWERTON, Judge.

This appeal arises from a suit by appellant Dravo Corporation, a bridge construction company, against the Commonwealth of Kentucky which resulted in a judgment dismissing the plaintiff's complaint after a lengthy trial by the court and extensive findings of fact and conclusions of law. On this appeal, Dravo Corporation cites numerous errors in those findings and conclusions.

The Department of Highways of the Commonwealth of Kentucky entered into a contract with Dravo Corporation in August 1970, for the construction of the substructure and approaches for the I–24 Interstate bridges across the Tennessee River in Marshall and Livingston Counties, near Paducah, Kentucky. The total estimated cost of the contract, based upon unit prices, was six million, two hundred twenty three thousand, four hundred ninety eight dollars and fifty six cents ($6,223,498.56). During the construction, five change orders were approved totalling $296,539.51. This increase, along with unit price payments paid on piles actually furnished and driven, brought the total construction cost to $6,520,038.07. This amount, in large part, reflected the cost of "furnishing" and "driving" piles to support the approach abutments on each end of the bridges, and the intermediate land and river piers.

After requesting compensation for extra work and exhausting subsequent administrative remedies, Dravo Corporation brought suit in October 1972, pursuant to the provisions of the contract claim statute, KRS 44.310 (subsequently amended).

Dravo's complaint alleged damages as a result of changes in the contract drawings, plans, requirements and specifications relating to bearing pilework for the substructure after work had begun on the project. Fur-

ther, it was alleged that Dravo encountered conditions in the rock and subsurface conditions at the project site which were different from the representations and drawings promulgated by the Highway Department and which constituted changed conditions resulting in additional expenses and extra work for which the contractor was entitled to compensation. The Highway Department admitted that it had changed the design in the contract drawings, but denied that the changes constituted changes in the contract requirement for which Dravo would be entitled to compensation beyond the unit prices paid for the work under the terms of the contract. Appellees additionally argued that the cost of the performance after the changes and alterations in the plans did not exceed the cost of the performance prior to such changes. Finally, the appellee argued that the character of the work had not been changed, and denied that subsurface conditions were different from those shown on the design drawings.

After preliminary hearings, motions, and discovery, a trial before the court was held in December 1973, lasting over a period of two weeks. The testimony of each party consisted entirely of engineering witnesses. A transcript of over 800 pages in eight volumes was compiled. Over 60 exhibits were introduced either jointly or by one of the parties. From this mass of information, the trial court entered a judgment dismissing appellant's complaint, based upon 31 separate findings of fact and 30 conclusions of law.

The briefs on this appeal are extensive and exhaustive. In the main, the argument of the appellant is that the trial court made several errors in its findings of fact and had these errors not been made, the conclusions of the trial court would have been counter to the conclusions and judgment rendered. The appellant argues that the trial court erred in concluding 1) that the subsurface conditions in the area of construction were not materially different from the representations of the substructure condition on the design plans and drawings for the bridge project, 2) that there were no misrepresentations on the design plans concerning the

subsurface conditions and bearing pilework, 3) that there was no withholding of material information to the plaintiff and other prospective bidders concerning the subsurface conditions, and 4) that the change by the Department of Highways in the design of the substructure, after construction commenced, did not result in extra work for the appellant, and did not change the character of the work required of the contractor. It is argued that findings contra to these would have necessitated the awarding of damages to Dravo Corporation.

We affirm the decision of the circuit court. It is our conclusion that the judge correctly followed the law of this commonwealth, based upon his findings of fact. Of course, as to the findings of fact, we are controlled by CR 52.01 which states in part— "Findings of fact shall not be set aside unless *clearly* erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." (Emphasis ours) On reviewing the great wealth of argument and evidence in this case, we cannot say that any of the findings of the trial court are manifestly against the weight of the evidence. While neither the parties nor the court had benefit of the opinion during the trial of this case, we believe that the judgment reached is in conformity with a recent opinion of this court. See *Codell Construction Company v. Commonwealth of Kentucky*, Ky.App., 566 S.W.2d 161 (1977).

It was stated by this court in *Codell, supra*, that:

Generally, government agencies can provide bidders with estimates and other related information without incurring a risk of liability as to the accuracy of such information and estimates, only so long as their intent to do so is made clear by an express and unqualified disclaimer as to the accuracy of the information.

The plan sheets, numbers 28 and 29, provided boring logs with related boring data, together with an "estimated pile tip" elevation. On the second of these sheets, a disclaimer was given, stating "These data are

furnished for information only, and may or may not represent the actual conditions which will be found when work is executed." The court buttressed its understanding of this disclaimer with additional facts concerning the entire concept of "test piles". The court determined that the entire concept of running test piles was to determine the length of piles required in the construction. Section 11 of the special notes in the contract proposal even provided that if the test results indicated the structure foundation required re-design to achieve safety standards, no claim would be made against the Department for costs or construction delays required by the redesign.

Upon driving the first test pile, it was found that the pile would not act as a friction-type pile to achieve the required 80-ton minimum bearing capacity. The pile was thereafter driven deeper until the desired bearing capacity was met and subsequently, the pile was driven even deeper until it met "refusal" or founded on solid rock.

■ The trial court concluded that there was no material misrepresentation to the plaintiffs in the plans or specifications, nor was there a withholding of any material or significant information from prospective bidders. The court held that the representations were intended to be "suggestive" of construction conditions, but that they were not to have been relied upon with exactness. The representations, especially in light of the disclaimer, could not be taken as positive representations. See *Christie v. United States*, 237 U.S. 234, 35 S.Ct. 565, 59 L.Ed. 933 (1915).

We believe that the soundness and logic of the circuit court's thinking is particularly well represented in one of its conclusions of law:

18. The Court concludes no "positive" representations were made on the boring logs in face of the numerous other provisions of the contract which strongly "suggest" that the subsurface conditions would be "erratic" when the pile driving began. Secondly, the plaintiff's alleged reliance upon the alleged "positive" representations cited above cannot be justified. The plans and specifications themselves alert prospective bidders that test pile lengths would vary somewhat due to "erratic" conditions of the subsurface and plaintiff should not have relied, with exactitude, upon such lengths in making his bid. Uncertainty flows even from the word designation, "*test*" piles. Other designations on the boring logs strongly suggest that it can be expected that the lengths of piles required would vary. These designations appear repeatedly on each of the 17 boring logs at pages 28 and 29 of the contract plans. Such designations were "*estimated* pile tip" elevations. The word "estimated" itself implies an opinion or judgment which is not conclusive until tested. Section 1.5.5 of the contract specifications provides: these specifications, the supplementary documents . . . *are intended to be complementary* and to describe and provide for a complete work. . . . Section 402.3.6H Test Piles. The contractor shall drive test piles of a length and at the location described on plans or determined by the Engineer. *These piles shall be of greater length than the length assumed in the design in order to provide for any variation in soil conditions.* (Emphasis added by trial court.)

■ As to the boring logs which were indicative of the subsoil in this area, the evidence was conflicting as to whether or not they were sufficient to alert a prospective bidder that subsurface conditions at the project site would be erratic. The trial court was apparently impressed by the testimony of appellee's witness, Lennertz. On the basis of his testimony, the trial court reasonably found that by plotting the number of "blow counts" required to penetrate the soil testing device a unit distance into the subsurface on a vertical and horizontal graph sheet, one could easily determine the "erratic" nature of the various layers of subsurface strata. The court found that even one of appellant's own witnesses agreed that such a graph would reveal erratic conditions.

When there is no express provision to the contrary, a contractor is assumed to have considered the risk of unforeseen events occurring during the course of his work. See *Codell, supra,* citing *O'Neill Construction Company v. City of Philadelphia,* 335 Pa. 359, 6 A.2d 525 (1939). Certainly that would be true here based upon the information provided in the contract as quoted above, especially in light of the specific disclaimer as to positive representations of the subsurface strata. As was held in *Codell, supra:*

> In a situation where the information and representations are intended to be suggestive of construction conditions, or the contract provides that they are to be taken as estimates only, then the governmental agency is not to be held accountable for variances which may be encountered on the job when there is no deliberate misrepresentation or fraud involved. (See the numerous out-of-state citations therein cited.)

We do not think this burden on the contractor is too great. It would seem that in contracts of this size, and there is no evidence to the contrary, that the bidding contractors are indeed experts in the type of construction required. The contractors are not compelled to bid on the project. If it is the contractor's opinion that he does not have sufficient time to make needed investigations, he should ask for more time or simply refuse to bid. There is no claim in this case that the actual boring log made available to the bidders was in error, much less that the appellees provided it knowing it to be erroneous. We find fraudulent misrepresentation to be the key to numerous decisions cited by the appellant.

Appellant's major argument concerning the withholding of material evidence focuses upon information and knowledge which may have been possessed by former U. S. government employees in their work on the construction of Kentucky Dam on the Tennessee River, approximately one mile from the site of the bridge construction. The evidence was conflicting as to whether or not information gathered for purposes of the dam would have been helpful in the construction of the bridge. The court found that little proof was introduced specifying the nature of this supposedly withheld information. Based upon the evidence given to the court, we do not think it was incorrect to determine that the information would have been of little use. Additionally, we agree that the Department of Highways would be put in an untenable position if a duty was imposed upon it to check with each of its employees to determine if there is possibly related information to a proposed bid.

Two bid items of work relating to this case were the furnishing and driving of 14BP 73 steel piles. The estimated quantities established in the contract for these items of work were 89,354 lineal feet of furnishing and a like quantity of driving. Final quantities were 111,641 lineal feet of furnished piles, with 98,966 lineal feet being driven. A unit price was established in the contract for the piles. Six dollars and fifty cents ($6.50) per lineal foot of piling furnished, and $6.50 per lineal foot for piling subsequently driven and accepted in place was paid. Additionally, a unit price was established for each splice ordered by the Department engineers to lengthen a pile so that it might be driven to the required penetration. After the initial test piles were driven, the Department of Highways and the Federal Highway Administration met and it was determined that the original design of the bridge would be modified. The re-design required the deleting of some piles, the use of steel reinforcing on the pier footers at certain locations where piles had been deleted, and the subsequent installation of "add-back piles", piles placed near other piles which were determined short of their required bearing capacity. Dravo was compensated at the contract unit price for furnishing and driving the add-back piles. The contract provided, as the court determined, that the Department of Highways had a right to alter the plans or change the details of the work as it did. It appears that the contractor was compensated through the unit price provision for addi-

tional work not initially anticipated. It would appear that it was for such a situation that the unit price provision was initially written. The contract document stated "In consideration whereof, the Department agrees to pay the party of the second part for all services actually performed in accordance with the unit price set forth in the bid proposal. . . ."

■ The court carefully considered appellant's attempt to establish damages. The court was unconvinced that there were damages resulting from the delay in the work. The plaintiff used what was termed "the critical path method" in attempting to show its damages. The court concluded that the method itself was susceptible to producing many different and inconsistent results which were insufficiently conclusive to meet the legal burden of proof for damages. Such a determination was clearly within the evidence presented to the court.

The sum and substance of the trial court's holding with which we agree is that the appellant assumed certain risks as to unforeseen conditions in the subsoil strata at the bridge construction site, encompassing the risk that the Commonwealth would be required to make changes in the construction specifications. Such a situation was anticipated by the contract between the parties, and extra work that was required of the contractor was compensated under the unit price provisions of the contract.

The judgment of the trial court is affirmed.

All concur.