**A & A MECHANICAL, INC., Appellant,**

v.

**THERMAL EQUIPMENT SALES, INC. Appellee.**

**No. 1998–CA–000807–MR.**

Court of Appeals of Kentucky.

July 23, 1999.

H. Edwin Bornstein, Robert L. Ackerson, Ackerson, Mosley & Yann, Louisville, for Appellant.

Gregory P. Parsons and Anne E. Gorham, Stites & Harbison, Lexington, for Appellee.

Before: BUCKINGHAM, HUDDLESTON, and KNOPF, Judges.

## OPINION

KNOPF, Judge:

In 1992 the University of Kentucky (UK) undertook the renovation of some of

the laboratory buildings on its Lexington campus. It awarded a contract for work on the laboratories' ventilation systems to A & A Mechanical, Inc. (A & A), the appellant. A & A in turn subcontracted with the appellee, Thermal Equipment Sales, Inc. (TES), which was to supply A & A with duct work and other materials. In April 1994, TES sued A & A for the alleged breach of their agreement, and by order entered March 24, 1998,[1] the Franklin Circuit Court awarded TES damages and attorney fees. Insisting that the trial court misconstrued, factually and legally, its agreement with TES, A & A appeals. We affirm.

In January 1993, during the bidding phase of UK's renovation project, TES sent a price list to A & A that included, among other prices, a quote of fifty-three thousand seventy-four dollars ($53,074.00) plus tax, for approximately nineteen thousand pounds (19,000 lbs.) of PVC coated duct and fittings and five hundred pounds (500 lbs.) of PVC coated "radioisotope stack and fittings." Soon thereafter, in February 1993, UK awarded the ventilation contract to A & A, and A & A in turn sent a purchase order to TES that provided in part as follows:

> Provide per plans, specs, addenda 1 and 2 and alternates 1 and 2 all round PVC coated ductwork and fittings including the radioisotope stack and fittings as found in but not exclusively in spec section 15810 for a total lump sum price of 53,074. [plus] Tax 3,184. [total] 56,238.

A sales representative of TES and A & A's project manager then met to discuss ordering and shipping details. They agreed that A & A would order specific sections of duct work as its needs became known, but would attempt to allow sufficient lead time for manufacturing. During the course of their discussion, the two (2) men realized that each had based his estimate of the quantity of duct work that would be required on plans prepared by UK's engineers and that the estimates were in close agreement. Both were aware, moreover, that this was a rehabilitation project and so was certain to require some deviation from the plans in order to accommodate pipes, wiring, and other fixtures the plans did not represent.

A & A ordered duct work in May, July, and October 1993. TES passed the orders along to its manufacturer, who shipped the goods directly to A & A and billed TES. TES apparently then billed A & A. Following completion of the second order and shipment, A & A had been billed and had payed slightly less than forty thousand dollars ($40,000.00). In the course of sending A & A's third order to the manufacturer, TES realized that the order would exhaust and slightly exceed the fifty-six thousand dollar ($56,000.00) total price provided for in the purchase agreement. Concerned, TES contacted A & A to find out how near completion the project was. A & A then, in November and December 1993, prepared a fourth order listing its remaining requirements. That order, TES calculated, would add nearly nineteen thousand dollars ($19,000.00) to the estimated total cost of the duct work. TES thereupon informed A & A that it would not fill the fourth order without additional payment. In response, A & A insisted that its fourth order was contemplated by the original contract and demanded that TES supply the remaining goods. The ensuing stalemate culminated in A & A's obtaining duct work to complete the project from a third party and TES's filing suit.

Referring to both TES's bid sheet and A & A's purchase order, the trial court ruled that the agreement between TES and A & A was for a definite quantity of duct work at a definite total price. It found that,

---

1. The March 24 order completed the proceedings by establishing the amount of TES's attorney-fee award. That order incorporated by reference a February 17, 1998 judgment, following a bench trial, that declared A & A's liability for both damages and fees. A & A appeals from both the judgment of liability and the determination of the fee award.

ultimately, the project required significantly more goods than had been agreed upon, and concluded that TES had fully performed and was entitled to recover the balance of the full contract amount. It further concluded that A & A's withholding payment for goods it had received justified TES's decision to cease performing. A & A takes issue with each of these propositions, but for the reasons discussed below, we are not persuaded that the trial court misconceived this agreement.

■■■ We begin our discussion by noting that this case was tried by the circuit court sitting without a jury. It is before this Court upon the trial court's findings of fact and conclusions of law and upon the record made in the trial court. Accordingly, appellate review of the trial court's findings of fact are governed by the rule that such findings shall not be set aside unless clearly erroneous. CR 52.01; *Largent v. Largent,* Ky., 643 S.W.2d 261 (1982). The trial court's conclusions of law, however, including its interpretation of the written contract, are subject to independent appellate determination. *Morganfield National Bank v. Damien Elder & Sons,* Ky., 836 S.W.2d 893 (1992).

■■■ As the parties correctly observe, the supply contract at issue was a contract for the sale of goods and so is governed by Article Two of the Uniform Commercial Code (UCC), adopted in Kentucky effective as of July 1, 1960, at KRS Chapter 355.2.[2] To further its goal of encouraging and simplifying commercial transactions, the UCC is more liberal than was the common law in permitting open terms in a

sales contract and in not requiring complete certainty or definiteness.[3] Under the code, even when certain terms are left open (such as those relating to price, time, and delivery), a contract for the sale of goods does not fail for indefiniteness or lack of mutuality if the parties have intended to make a contract and there is a reasonably certain basis for granting appropriate relief. KRS 355.2–204(3). The requirement that there be a basis for relief, however, necessitates that the contract provide a quantity term, for without such a term that basis is lacking. David J. Leibson and Richard H. Nowka, *The Uniform Commercial Code of Kentucky,* n. 201 at 74 (2d ed. 1992 & Supp.1998). But, as A & A correctly observes, the quantity term need not be fixed. Code section 2–306(1) (KRS 355.2–306(1)) provides that the quantity term may be measured by the output of the seller or the requirements of the buyer:

> A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded.

■ There is no dispute in this case that the parties intended to make a contract. The question is whether they arrived at terms sufficiently definite to permit enforcement. A & A maintains that they did, and claims that the terms should be gleaned exclusively from its purchase or-

---

**2.** As defined in KRS 355.2–105,
 "Goods" means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (Article 8) and things in action. "Goods" also includes the unborn young of animals and growing crops and other identified things attached to realty as described in the section on goods to be severed from realty (KRS 355.2–107).

"Sale" and "Contract for sale" are defined in KRS 355.2–106:
 "Contract for sale" includes both a present sale of goods and a contract to sell goods at a future time. A "sale" consists in the passing of title from the seller to the buyer for a price (KRS 355.2–401).

**3.** *See in general,* David J. Leibson and Richard H. Nowka, *The Uniform Commercial Code of Kentucky* (2d ed. 1992 & Supp.1998).

der. Its reasoning is not entirely clear, but it seems to argue that TES's bid sheet either was not an offer because it was only an invitation, or, if TES's bid was an offer, that its own purchase order amounted to a counter-offer, which became an integration upon TES's acceptance. In either case, A & A insists that its purchase order is a writing intended to summarize the bargain, and thus that the trial court erred by appealing to circumstantial evidence to alter the terms of the purchase order. Those terms, A & A claims, were a fixed price (some $56,000.00) in exchange for all the PVC coated duct work required to complete the job.

Article Two of the UCC has retained a parol evidence rule, KRS 355.2–202, but the rule applies only to writings or memoranda clearly "intended by the parties as a final expression of their agreement with respect to such terms as are included therein...." Even when the rule does apply, the final writing

> may be explained or supplemented
> (a) by course of dealing or usage of trade (KRS 355.1–205) or by course of performance (KRS 355.2–208); and
> (b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

We are not persuaded that the trial court misapplied the parol evidence rule in this case.

 A principal purpose of the UCC is to lower transaction costs by permitting covered parties to rely on certain objective standards of fair and reasonable dealing. KRS 355.1–102; KRS 355.1–203. Parties wishing to disclaim UCC provisions may, to a limited extent, do so, but deviations from the Code and from the presumptions underlying it should be clearly expressed. KRS 355.1–102(3); *Kentucky Utils. Co. v. South E. Coal Co.*, Ky., 836 S.W.2d 392 (1992). One such presumption is that, in the absence of a writing clearly intended to exclude it, a trial court may consider evidence of circumstances surrounding the agreement—particularly with respect to related writings, course of dealing, course of performance, and usage of trade—to explain and supplement, but not to contradict, the agreement's written terms. KRS 355.1–205; KRS 355.2–204; KRS 355.2–208.

In determining the quantity term of this agreement, the trial court referred to TES's bid sheet as well as to the parties' course of performance and other surrounding circumstances. The bid sheet specified a particular quantity of duct work, expressed in pounds, and a particular price. The trial court understood the inclusion in A & A's purchase order of TES's exact price to be a sufficient reference to the bid sheet to incorporate its quantity term as well.

In disputing this finding, A & A notes that the reverse side of its purchase-order form included the following merger clause:

> The entire agreement between the parties consists of this Purchase Order and any documents incorporated by reference as stated herein and no other acceptance or acknowledgement [*sic*] or other conditions will apply. Amendments, if any, will be made in writing by mutual agreement only and must be signed by both parties.

A & A maintains that this clause precludes reference to TES's bid sheet and that, without such reference, the purchase order must be construed as calling for an unlimited quantity of duct work, that is, all the duct work required to complete the job. We do not agree that reference to the bid sheet and other circumstances was precluded.

As A & A correctly notes, the standard method to integrate an agreement and thus to limit the relevance of surrounding circumstances is to include a merger clause in the final writing. It has been held, however, that, even a merger clause, to overcome the UCC's presumption in favor of the admissibility of course of deal-

ing, course of performance, and usage of trade evidence, must expressly refer to such evidence. *Columbia Nitrogen Corp. v. Royster Co.*, 451 F.2d 3 (4 th Cir.1971); Liebson and Nowka, *The Uniform Commercial Code of Kentucky,* 2 nd ed. at 52 (1992). Without such a requirement, merely formal merger clauses, such as A & A's here, could easily frustrate the Code's policy of encouraging the enforcement of relatively informal agreements.

We are not persuaded that the trial court misapplied A & A's merger clause. First, by its own terms the clause contemplates the incorporation of other writings clearly identified in the purchase order. We agree with the trial court that TES's bid sheet was so identified. Furthermore, the clause does not expressly preclude consideration of evidence tending to show course of dealing, course of performance, or usage of trade, and thus does not overcome the presumption that such evidence may be considered. The trial court did not err, therefore, by construing the contract in light of standard practices in the industry and in light of A & A's contract with UK. A & A's pre-Code authority suggesting that the presumption should work the other way (*i.e.* that an integration should be presumed from the existence of the writing unless the writing clearly indicates a contrary intent), has been superseded by the Code.

▌ A & A further maintains that TES's bid sheet was not an offer. Whether a supplier or sub-contractor's price quotation is an offer or merely an invitation to offer is a question of fact to be determined from the terms of the quotation and the circumstances. *Cannavino & Shea, Inc. v. Water Works Supply Corp.*, 361 Mass. 363, 280 N.E.2d 147 (1972) (supplier's price list sent to several potential contractors deemed a solicitation); *Earl M. Jorgensen*

*Co. v. Mark Constr., Inc.*, 56 Haw. 466, 540 P.2d 978 (1975) (steel supplier's signed bid sheet upon which contractor based its own bid for highway contract deemed an offer).[4] Here, TES's quotation was not a general list of prices, but was addressed to the particular project at UK. In addition, TES's bid sheet was signed, indicating a firm commitment to the stated price and quantity for the duration of the bidding period. KRS 355.2–205. The trial court did not clearly err by finding that this bid sheet was an offer.

▌ A & A contends that, even if TES's bid was an offer, its own purchase order amounted to a counter-offer rejecting TES's fixed quantity term and substituting a "requirements" term as that word is used in KRS 355.2–306. The trial court rejected this construction and held instead that the contract was for the quantity of duct materials specified in TES's bid sheet.

▌ Under the common law, an acceptance would not give rise to a contract unless it mirrored the terms of the offer; any significant deviation operated as a rejection and counter-offer. Restatement (Second) of Contracts § 59 (1981). To further its policy of encouraging and simplifying contract formation, the UCC significantly alters this rule. KRS 355.2–207, **Additional terms in acceptance or confirmation,** provides as follows:

(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

---

4. A primary purpose of the UCC is to foster a consistent commercial law among the different states. KRS 355.1–102(2)(c). It behooves us, therefore (courts and practitioners), to become acquainted with business practices and Code interpretations in jurisdictions other than our own. Foreign authority remains non-binding, but the Code's goal of consistency enhances that authority's persuasiveness. *But see, Ditch Witch Trenching Company of Kentucky v. C & S Carpentry Services, Inc.,* Ky.App., 812 S.W.2d 171 (1991).

(2). The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

(a) The offer expressly limits acceptance to the terms of the offer;

(b) They materially alter it; or

(c) Notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

(3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this chapter.

Again, the difference between the UCC's approach and that of the common law is largely a matter of initial presumptions. Under the Code, an acceptance is presumed to be an acceptance of the offer as made, and the inclusion of additional terms in the acceptance is presumed not to negate the original offer, but to supplement it. If the offeree's intention is to reject the offer and to make a counter-offer, this intention should be clearly expressed. *Consolidated Aluminum Corp. v. Krieger*, Ky.App., 710 S.W.2d 869 (1986). The offeree's silence with respect to an offered term is not sufficient to reject or to modify it. *Earl M. Jorgensen Co. v. Mark Construction, Inc., supra.* The trial court did not err, therefore, by ruling that A & A's silence with respect to the quantity offered in TES's bid sheet did not change the agreement from one for a fixed quantity of duct materials to one for A & A's requirements.

Even if the agreement were a requirements contract under KRS 355.2–306, moreover, A & A would not be entitled to relief. As noted above, KRS 355.2–306 restricts the quantity term of a requirements contract to an amount not "unreasonably disproportionate to any stated estimate . . . ." A & A admits, however, that TES's initial estimate, based on the plans provided by UK's engineers, was reasonable. It further admits that the quantity actually required for the project was at least twenty-nine percent (29%) more than had been estimated.[5] This is clearly an unreasonable deviation from the stated estimate. *Cf. Lowder v. North Carolina State Highway Commission*, 26 N.C.App. 622, 217 S.E.2d 682 (1975) (holding that fifteen percent (15%) is a significant variation of a major contract term); *The State of Washington, Dept. of Fisheries v. J–Z Sales Corporation*, 25 Wash.App. 671, 610 P.2d 390, 394 (1980) (observing that, "[i]t has been held as a matter of law that a demand for goods in excess of 20 percent over the offeree's estimate is 'unreasonably disproportionate' "). A & A's demand for extra performance would thus not be supported by KRS 355.2–306 even were that provision to apply.

We also observe that the supply contract at issue here is not the sort of contract ordinarily thought of as a requirements contract under KRS 355.2–306. Requirements contracts generally arise in situations where a unit price can be determined but the total quantity of units cannot. Even in that situation, the obligation to supply or to buy units is not unlimited, but is subject to the notion of "reasonable proportion." *See Empire Gas Corporation v. American Bakeries Company*, 840 F.2d 1333 (7th Cir.1987) (discussion by Judge Posner). Here, there was no attempt to establish a unit price to which both parties were willing to commit themselves. Instead, the agreement contem-

---

**5.** $17,000.00, A & A's expenditure for "extra" duct work, divided by $57,000.00, the original estimate, times 100%.

plated a total price for a given quantity of duct work, which both parties believed was a reasonable estimate of the quantity required for the project. Both parties also recognized that the quantity ultimately required was apt to exceed the estimate, but this contingency was addressed by the provision in A & A's contract with UK allowing for additional payment for "extra" materials and labor.

Such provisions have become a common manner of organizing construction projects, which frequently require preliminary estimates of hard-to-determine conditions. *Catapano Co., Inc. v. City of New York*, 116 Misc.2d 163, 455 N.Y.S.2d 144 (1980); *but see Dravo Corporation v. Commonwealth, Department of Highways*, Ky. App., 564 S.W.2d 16 (1977) (holding that, in light of owner's explicit disclaimer, construction contractor could not rely upon owner's estimate without assuming the risk that such estimate would prove inaccurate). These provisions typically require the contractor, during the course of performance, to call the owner's attention to situations the contractor believes to be "extra" so that the owner can determine if, in its judgment, the situation really is outside the contract, and if so how to address it. Allowing thus for adjustments of the contract in light of the actual conditions encountered obviates both expensively detailed pre-contract estimates and high, 'worst case', bids. *Catapano, supra.* It places the risk of extra expense on the owner, who should bear it since he is the one benefitting from the extra labor and materials, but at the same time affords the owner protection against the contractor's fraud or inefficiency. This is clearly the arrangement under which both A & A and TES understood themselves to be operating.

A & A's project manager testified that during the early stages of the installation he realized that he was consuming more duct work than had been projected because the ducts frequently had to detour around pipes or other obstacles the plans did not include. He was also aware that A & A's contract with UK permitted him to request additional compensation for "major" additions to the contract. Nevertheless, he did not request additional compensation from UK for the extra duct work because he judged most of the reroutings "minor," and concluded that the aggregate of such "minor" alterations would also be "minor."[6] When TES finally realized what had happened and demanded additional compensation, A & A belatedly brought the matter before UK's supervising engineer, who denied A & A's request for additional funds on the ground that A & A had not abided by the contract's notice provisions. A & A thereupon took the position *vis-a-vis* TES that the additional duct work had been deemed a "minor" extra under the contract and thus was non-compensable.

If, somehow, TES's claim had arisen despite its extra performance having been properly submitted to UK for approval, it is at least conceivable that A & A would have been entitled to rely upon UK's denial as a defense against TES.[7] Having compromised TES's claim, however, by independently deciding that no additional compensation was due for the extra materials, A & A will not now be permitted to shield itself behind UK's decision, a decision apparently not based on the

6. Logicians refer to such invalid inferences from parts to whole as the fallacy of composition: Because the atoms of this book are invisible, the book must be invisible.

7. The trial court, noting that the purchase order did not include a "pay when (or if) paid" clause, seems to have reasoned that UK's response to claims for "extras," whether those claims were timely or otherwise and whether the response was on the merits of the claim or not, could have no bearing on A & A's liability to TES. We are uncomfortable with that proposition, but because A & A did not make a timely claim for the extra duct materials and because UK did not decide the merits of TES's claim, the question is not before us, and we therefore decline to address it.

claim's merits. A & A knew the basis of TES's estimate. Under its duty to deal with TES in good faith, A & A was not entitled substantially to exceed that estimate without either seeking additional compensation from UK or providing additional compensation itself. The trial court did not err by so concluding.

In addition to slightly less than twenty thousand dollars ($20,000.00) in damages, the trial court awarded TES attorney fees in excess of fifty-five thousand dollars ($55,000.00). The fee award was made pursuant to the following provision of A & A's purchase order:

> It is agreed by Vendor and Contractor that ... [i]n the event an action is brought to enforce the provisions of this Purchase Order, the prevailing party shall be entitled to recover its costs of suit and reasonable attorney's fees.

A & A maintains that the fee award is excessive.

▮▮▮ As a general rule, the amount of an attorney-fee award is a matter entrusted to the discretion of the trial court:

> The trial judge is generally in the best position to consider all relevant factors and require proof of reasonableness from parties moving for allowance of attorneys fees.

*Cadillac Olds, Inc. v. Roberts*, Ky., 813 S.W.2d 287, 293 (1991). It is true, as indicated by the above quotation and as A & A observes, that this discretion is not unlimited, that, in exercising its discretion, a trial court should require parties seeking attorney fees to demonstrate that the amount sought is not excessive and accurately reflects the reasonable value of bona fide legal expenses incurred. *Brown v. Fulton, Hubbard & Hubbard*, Ky.App., 817 S.W.2d 899 (1991). The trial court here fulfilled this obligation. At the behest of the trial court, TES submitted a detailed invoice (some forty-three (43) pages) of its attorneys' charges. Although there is room to quibble over some of the amounts charged, such as those for trial preparation and post-trial briefing, the invoices adequately support the decision of the trial court upholding the claimed fee. If the trial court's determination is reasonable, the fact that there may be other reasonable conclusions is not a sufficient basis for overturning the award. This litigation has continued for several years, primarily as a result of A & A's persistence, and has included numerous instances of "last minute" preparation in response to A & A's introduction of new theories. Although the fee award is well in excess of the award of damages, there is no rule requiring strict proportionality between the two. *Meyers v. Chapman Printing Co., Inc.*, Ky., 840 S.W.2d 814 (1992). The trial court has not been shown to have abused its discretion.

In sum, the sales agreement between TES and A & A is governed by the Uniform Commercial Code as adopted in KRS Chapter 355. The contract contemplated a fixed quantity of duct work for a fixed price with approval to be sought from the owner for duct work significantly in excess of that fixed quantity. A & A's failure to seek the owner's approval when appropriate and its refusal to pay for duct work it had received constituted a breach of the agreement entitling TES to damages. A & A is also liable under the contract for TES's reasonable attorney fees, and the trial court's determination of the extent of that liability was within its discretion.

For these reasons, we affirm the March 24, 1998, order of Franklin Circuit Court.

ALL CONCUR.